# THE EXCELSIOR.

APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES
FOR THE EASTERN DISTRICT OF VIRGINIA.

Submitted October 11, 1887. — Decided October 24, 1887.

In this case the services rendered by a corporation whose business was that of a wrecker and salvor, to a vessel in distress were held to be salvage services of a meritorious character.

No agreement having been made for a fixed sum to be paid, nor any binding engagement to pay at all events, although there was an agreement to submit to arbitration the amount to be received for the service, in case the two principals could not agree upon a sum, it was held that there was no bar to the claim for salvage.

Comments upon the effect of a conversation at the time between the masters of the two vessels.

The effect of the agreement to submit to arbitration considered.

A salvage of $5600 having been awarded by the Circuit Court on the basis of 3½ *per cent* on $160,000 of value saved, this court, not being able to say, as a question of law, that the allowance was excessive, affirmed the decree.

THIS was a libel *in rem*, in admiralty, in a cause of salvage, filed by the Baker Salvage Company, a corporation of Virginia, against the steamer Excelsior and her cargo, in the District Court of the United States for the Eastern District of Virginia. That court awarded to the libellant, by a decree made on the 21st of February, 1884, the sum of $5600, as salvage, being 3½ *per cent*, on $160,000, the value of the Excelsior having been found at $150,000, and the value of her cargo at $10,000. 19 Fed. Rep. 436. The claimant appealed to the Circuit Court, which, on the 19th of May, 1884, affirmed the decree of the District Court, with interest on the $5600 from the date of the decree of the District Court, until paid, at the rate of six *per cent per annum*, and the costs of suit.

The Circuit Court found the following facts and conclusions of law:

"On the afternoon of the fourth of December, 1882, at five o'clock, the steamer Excelsior, Captain T. E. Baldwin, of the

Potomac Steamboat Company, plying between Norfolk, Va., and Washington, D. C., touching at Old Point, Fortress Monroe, left her dock at Norfolk, steamed down the Elizabeth River and into Hampton Roads, heading the usual course to make a landing at Old Point wharf. She had on board a competent crew and an average number of passengers, the agreed value of the steamer being one hundred and fifty thousand dollars and of her cargo ten thousand dollars.

"As the Excelsior was heading the aforesaid course in Hampton Roads, at or near six P.M., the United States steam tug Fortune came into collision with her, by an accident. The Fortune struck the Excelsior, which is of wood, on the starboard bow, making a hole in her hull at least 8 by 10 feet; and, it being apparent that the Excelsior must otherwise sink in deep water, from the quantity she was making in her hull through the hole in her bow, she was promptly headed for the shore, going ashore on the south side of Hampton bar, at about its middle point, about two miles from Old Point wharf, three or four miles from Sewell's Point, between half a mile and a mile from the Soldiers' Home shore, the nearest shore, and within a hundred yards of the channel, where she sank, full of water, with a hole extending from her hurricane deck far down under water, lying almost head on to the shore, in water ranging in depth from six to seven feet at her bow to from ten to twelve feet at her stern.

"After ascertaining the above soundings and landing his passengers at Old Point Comfort, Captain Baldwin, of the Excelsior, proceeded to the same point and sent the following telegram to The Baker Salvage Company, at Norfolk, Va.:

"'December 4th, 1882.

"'Send assistance, with steam pumps, to Excelsior, on Hampton bar: Get here by low water.'

"Subsequently, Captain Baldwin sent another telegram, as follows:

"'Dec. 4th, 1882.

"'Del'y guaranteed. Bring steamer Resolute, a diver, with appliances.'

" The first of these telegrams was received at the telegraph office, in Norfolk, at 8.2 P.M., and the other at 9.15 P.M., on the evening of the collision.

" The Baker Salvage Company, through the agency of its superintendent and general manager, Captain E. M. Stoddard, at once, and vigorously, set to work in response to the telegrams, to render the aid asked for; and, at or about ten P.M., a fully equipped expedition, under the command of Captain Stoddard, left Berkeley, opposite Norfolk, at the intersection of the southern and eastern branches of the Elizabeth River, where the wharves of The Baker Salvage Company are located, for the purpose of relieving the Excelsior. The expedition consisted of the powerful wrecking steamer Resolute, Hobbs, master, with her stationary steam pump, capable of pumping four hundred tons per hour, with the schooner Scud in tow, having on board a portable steam pump capable of pumping one hundred tons per hour, and a full complement of wrecking material and appliances, the whole manned by a crew of ten seamen experienced in wrecking operations, and accompanied by a skilled diver, with diving apparatus. Captain Stoddard, making all reasonable haste, and in the exercise of his judgment, did not attempt to go alongside of the Excelsior that night, not knowing her exact position on Hampton bar, and being unable to identify her lights, but went directly to Old Point wharf, where he arrived about one o'clock on the morning of December 5th, when it was flood tide there. Between that hour and daylight he secured the services of a number of laborers at Old Point, whose services he anticipated would be needed to remove the cargo, thus materially advancing the work for which he had come. At daylight on the morning of the 5th of December, Captain Stoddard, with the expedition above described, went to the Excelsior, and found her lying, as above described, submerged to her main deck, with a hole in her bow, and full of water, water standing on her main deck aft at high tide, and about two feet below her guards at low tide.

" The Excelsior's cargo had not been reached by the water, being stored about amidships, which was higher than the stern.

Captain Stoddard at once had an interview with Captain Baldwin, in the presence of the purser of the Excelsior. Captain Baldwin asked what it was going to cost to get the ship off and deliver her at the railroad. Stoddard replied: 'I do not know;' to which Baldwin replied: 'This is not a salvage service;' to which Stoddard replied: 'Call it what you please, so I get my pay;' to which Captain Baldwin replied: 'It is no salvage service;' and they both agreed to submit to arbitration the amount to be received for the service by The Baker Salvage Company, in case the two companies could not agree upon a sum.

"At this point, viz., about seven o'clock on the morning of the 5th, Captain Stoddard began the direct operations upon the Excelsior and her cargo, for their relief. He brought the Scud alongside the Excelsior, for the purpose of removing the steamer's cargo to Old Point wharf, and, placing the diving apparatus aboard the Excelsior, set the diver to work to ascertain minutely the exact extent of the wound that had been sustained by the steamer in the collision; and, while this was going on, he returned to Old Point wharf in the Resolute, and brought off the laborers above mentioned, who had been employed to assist in the removal of cargo, and lumber to be used by the diver in battening up the hole.

"The work of removing the cargo to Old Point wharf was continued throughout the day, until, after three trips of the Scud, in tow of the Resolute, it was successful between four and five o'clock of the afternoon of the 5th of December, without loss, the work being done under the management and at the risk of The Baker Salvage Company, the second officer of the Excelsior supervising the same, hurrying up the laborers, keeping their time, and seeing that nothing was stolen.

"The diver, who began his operations about seven A.M. of the 5th of December, as aforesaid, worked steadily until the night of that day, battening up the hole with plank and covering the same with canvas. Resuming his work at an early hour the next morning, he completed it by one P.M. of the same day, the 6th.

"On the afternoon of the 5th, after the removal of the

cargo to Old Point wharf had been completed, and the Scud anchored for safety inside Hampton bar, with but one man left aboard of her as a guard, the Resolute came alongside the Excelsior on her starboard or weather side, put out fenders, made fast so as to be in position to use her stationary pump, and began to assist in the work of setting up the portable pump on board of the Excelsior. The work of setting up this portable pump was continued until nine P.M., the pump and all attachments being furnished by The Baker Salvage Company, only the steam for running it being supplied by the donkey engine of the Excelsior, while the Resolute was lying on the Excelsior's starboard side or windward side, as aforesaid. Between seven and eight o'clock on December 5th it began to blow a fresh or strong breeze from the east or southeast, so as to induce the master of the Excelsior to request that the Resolute lie alongside of the steamer, for the protection of the lives of those aboard of her, in case her joiner work should be carried away and she should begin to break up. The Resolute thus continued to lie on the starboard or weather side of the steamer, it being impracticable to shift her position to the lee side in such a breeze and with such a sea on; and, while lying thus, she afforded considerable protection to the Excelsior, acting as a breakwater to her, and incurred considerable risk herself. This wind, which produced quite a rough sea, lasted from between seven and eight o'clock in the evening of December 5th until about one o'clock on the following morning, during which time a portion of the crew of the Resolute had to be constantly at work putting in new fenders between the steamers as others would be crushed by the chafing, and keeping them in position; to do which it was necessary to go between the two steamers upon their guards, with no little danger to life or limb. Steam was also kept up on the Resolute all night, for immediate use, in case of emergency.

"Soon after daylight on the morning of the 6th work was resumed; the diver and gang battening up the hole, the crew of the Resolute, under the superintendence of Captain Stoddard, getting ready the stationary pump on board the Resolute, and completing the work of setting up the port-

able pump on board the Excelsior that had been begun the previous evening. The latter was completed about nine A.M., of this day, the 6th, as aforesaid, and was set to work to lower the water in the hold of the steamer, and thus assist the diver in his work of covering the planking with canvas, by drawing the canvas in. The stationary pump was ready by 12 M.; and, the diver completing his work of battening soon after that, both pumps were set to work at their full capacity, so that, at or near 2.3 P.M., the hull of the Excelsior had been so far freed from water, that the tug Olive Baker, that had been previously engaged to assist in the work, and had a line attached, hauled the steamer afloat. Captain Stoddard at once started to Norfolk with the Excelsior, having her in tow of the steam tugs Olive Baker and Olive Branch, and the wrecking steamer Victoria J. Peed, while the Resolute kept alongside, pumping every twenty minutes, to keep the hull free from water. Great care was exercised in towing the the steamer across Hampton Roads and up the river to Norfolk, as the hole in her bow was only covered with pine boards, one inch thick, and one thickness of No. 1 canvas, which might be knocked off by any hard substance floating in the water, that might come in contact with it. The work was successfully accomplished, however, and by five P.M., of December 5th, 1882, the Excelsior had been safely docked in Norfolk.

" The salvage service was thus successfully completed within less than 45 hours after the aid of the salvors had been invoked, and that without a single error of omission or commission on their part. The work was done with an energy, skill, fidelity, and courage that admit of no question. The officers and crew of the Excelsior rendered all the aid in their power to the salvors."

" The point at which the Excelsior was lying is on the south side of Hampton bar, about midway between its northeastern and southeastern extremities, and on the northern border of Hampton Roads; the locality, an exposed one, vessels ashore there being exposed to all winds from the east round to the southwest, and winds from the east come right in from the Atlantic Ocean, through the Capes on to the bar, with no

breakwater, except that furnished by the rip-raps and the small shoals about it.　The weather, as it actually existed during the greater portion of the time of the salvage service was moderate, with light winds and no very heavy sea; but, on the evening of the 5th of December, a strong breeze set in from the east or southeast, between seven and eight o'clock, which lasted until one o'clock on the morning of the 6th, causing the water to be rough, and creating considerable apprehensions for the safety of the Excelsior. This constantly threatened danger was increased by the fact that the Excelsior is an expensively furnished bay and river steamer, standing very high out of the water, and composed almost entirely, above her main deck, of light joiner work, liable to be carried away by winds and waves, with guards from two to three feet wide at her stern to ten or twelve feet wide at her wheel-houses, under which, in her then present position, the waves struck with great force, since she could not rise with them, liable to tear up her guards, and to cause her slender joiner work to give way and the steamer to break up. These things rendered despatch necessary.

" The Baker Salvage Company, the libellant, is a body politic and corporate, with its principal office located at Norfolk, in the State of Virginia. Its business is that of wrecker and salvor, in which it is extensively engaged, its operations being conducted in the Atlantic Ocean and Gulf of Mexico, and along the coasts of those waters and the waters tributary thereto, wherever its services may be needed. The capital embarked in the said business is about one hundred thousand dollars, and it keeps constantly on hand, and in readiness for immediate use in its business, a number of powerful steamers and sailing vessels, proper for wrecking services, with a full equipment of the best and most improved wrecking apparatus and gear, such as steam pumps and connections, diving apparatus and gear, hoisting engines, anchors, chains, and cables of unusual size, falls, with a competent force of seamen, navigators, and divers, who have attained skill from their experience in wrecking operations. This immense equipment is kept up at an average expense of five thousand dollars per

month during the busy months — say, eight months in the year — and at an average of two thousand five hundred dollars during the balance of the year, and that, exclusive of interest on the large amount of capital invested, being the mere running expenses.

"In addition to the wrecking steamers Resolute and Victoria J. Peed, and the schooner Scud, with all the wrecking appliances and apparatus, its own property, which The Baker Salvage Company had employed in this service, it had also chartered, and used to assist in the work, the steam tugs Olive Branch, Olive Baker, and Nettie. The Baker Salvage Company had exposed to dangers incident to this salvage service at least fifty thousand dollars' worth of its valuable property, which, in the case of destruction, must have been a total loss, since insurance companies will only insure property so engaged at exorbitant rates, if at all. And the court finds that the libellant is entitled, for its salvage service in this cause, to the sum of five thousand six hundred dollars, with interest thereon from the 21st day of February, 1884, until paid;" "and the court finds the law to be, that this is a case of salvage;" "that the alleged contract which the claimant attempts to set up is no bar to a meritorious claim for salvage, in admiralty; that the libellant, the salvor, is entitled to be rewarded for the salvage service in proportion to the personal risk run by its employes while engaged in this salvage service, to the danger to which its valuable wrecking equipment was exposed while engaged in this service, to the danger from which the large and valuable property of the claimant has been relieved, to the labor expended by the salvors in rendering the salvage services, and the promptness, skill, and energy with which those services were rendered."

The claimant of the Excelsior and her cargo appealed to this court, and assigned for error, (1) that the Circuit Court, in its finding of facts, had ascertained and stated as proved, an agreement between the libellant and the claimant for a *quantum meruit* for the work and labor done by the libellant, and ought not to have decreed salvage therefor; (2) that the award was excessive in amount.

*Mr. Theodore S. Garnett* for appellant.

I. While it is not contended that the libellant should not receive a proper compensation for the work done by him, yet it is submitted that the question of salvage was here fairly raised and settled between the parties before any work was done on the vessel.

It was distinctly expressed by Captain Baldwin that this service was not to be charged for *as salvage,* and that view was assented to by the libellant's agent when he said, " Call it what you please, so I get my pay," and accepted the service.

There was a distinct announcement that *at all events* he must be paid, and there was immediate assent to that proposal by Captain Baldwin, for the work was at once allowed to proceed.

Here there was a stipulation for payment at all events, not conditioned upon success, but to be paid at all events, and such a bargain is inconsistent with the claim of *meritorious salvage.*

Upon this point, counsel would adopt the language of the court in the case of *The Independence,* 2 Curtis, 350, 355.

" In my judgment, a contract to be paid at all events, either a sum certain or a reasonable sum for work, labor and the hire of a steamer or other vessel, in attempting to relieve a vessel in distress, without regard to the success or failure of the efforts thus procured is *inconsistent* with a claim for salvage ; and when such contract has been fairly made, it must be held binding by a Court of Admiralty and any claim for salvage disallowed."

" When the owner or his representative, or both, become personally liable by the contract to pay either an agreed sum or a *quantum meruit* for the labor and service rendered, without regard to its results, the parties do not contemplate nor engage in a salvage service, but quite a different service. . . . I do not perceive how a Court of Admiralty can, after the property has been saved, set aside such a contract and declare that a salvage service was performed."

II. The award is plainly and grossly excessive.

If it be found that the parties were contracting for services which were to be paid for without regard to success or failure, then it is plain that the court erred in decreeing compensation as *salvage*. The reward should have been in proportion to the character and amount of the service rendered.

*Mr. W. H. C. Ellis* for appellee.

MR. JUSTICE BLATCHFORD, after stating the case as above reported, delivered the opinion of the court.

(1) It is contended, on the facts found, that the question of salvage was fairly raised and settled between the parties before any work was done on the vessel; that what passed amounted to an announcement by Captain Stoddard, the master of the libellant's wrecking steamer, that he must be paid for his services at all events; that this proposal was assented to by the master of the Excelsior; that the work proceeded under that arrangement; and that, therefore, there could be no claim for salvage.

It is very clear that the services rendered by the libellant to the Excelsior constituted a salvage service of a meritorious character. The telegrams sent to the libellant, by virtue of which it entered upon the service, summoned it as a salvor; and the services detailed in the finding of facts constituted salvage services. No agreement was made for a fixed sum to be paid, nor any binding engagement to pay at all events, although there was an agreement to submit to arbitration the amount to be received by the libellant for the service, in case the two companies could not agree upon a sum. It was, however, held by this court, in the case of *The Camanche*, 8 Wall. 448, 477, that "nothing short of a contract to pay a given sum for the services to be rendered, or a binding engagement to pay at all events, whether successful or unsuccessful in the enterprise, will operate as a bar to a meritorious claim for salvage."

Nor was there in this case any agreement for a *quantum meruit* for the work and labor to be done by the libellant. In the case of *The Independence*, 2 Curtis, 350, 357, the proper

rule on the subject was laid down by Mr. Justice Curtis, in these words : " To bar a claim for salvage, where property in distress on the sea has been saved, it is necessary to plead and prove a binding contract to be paid at all events for the work, labor, and service, in attempting to save the property, whether the same should be lost or saved." A binding contract of that character is not proved by such a conversation as took place between the respective parties in the present case. In *The Salacia*, 2 Hagg. Adm. 262, 265, it was shown that the master of the salvor vessel declared at first " that he should not demand any salvage, but that his crew would not work unless paid for their labor, and that they declined taking a dollar a day, but would take two." As to this, Sir Christopher Robinson said : " It is probable that some such conversation may have passed at the beginning of this service, but it might not be known what would be the extent of it; and the court is not in the habit of considering such loose conversations as conclusive of the merits of any case, when brought regularly before it." In the present case, there was no assent by Captain Stoddard to the statement of Captain Baldwin that the service was not a salvage service, and the assertion by Captain Stoddard that the name of the service was immaterial, so long as he should get his pay, was fairly a statement that he should insist on his pay for the services according to their actual character.

The answer sets up an agreement between the masters of the respective vessels, after the Resolute had arrived at the place where the Excelsior was, that no salvage would be claimed by the libellant. Not only is it not found by the Circuit Court that any such agreement was made, but, on the facts found, the question was left open as to whether the services were to be paid for as salvage services, in case of success. Moreover, at the time of the conversation between the masters, the salvage service had been partly rendered, because the expedition had been fitted out, and the Resolute and her accompanying schooner, and the steam pumps and other appliances, and the diver, had been taken to where the Excelsior was, in compliance with the summons of her master.

Nor can the agreement for arbitration affect the question of a salvage service. In the case of *The Raisby*, 10 P. D. 114, there was an agreement to tow a ship in distress, "the matter of compensation to be left to arbitrators at home, to be appointed by the respective owners." As to this, Sir James Hannen said: "This, however, was valueless as an agreement. It could not have been pleaded as any answer to an action for salvage brought in the ordinary way in the Admiralty Division, and if effect could have been given to it at all, it would only have been by bringing an action upon it for not submitting to arbitration."

(2) As to the amount awarded, the case is not one where, as a question of law, this court can say that the allowance was excessive. On the contrary, it seems to have been reasonable and fair, at least as respects the claimant of the Excelsior and her cargo.

In the recent case in this court of *The Connemara*, 108 U. S. 352, the question involved was so fully considered that it is only necessary to refer to that case, as establishing the principle, that, "since the Act of 1875, in cases of salvage, as in other admiralty cases, this court may revise the decree appealed from for matter of law, but for matter of law only; and should not alter the decree for the reason that the amount awarded appears to be too large, unless the excess is so great that, upon any reasonable view of the facts found, the award cannot be justified by the rules of law applicable to the case." See, also, *The Tornado*, 109 U. S. 110, and *The Hesper*, 122 U. S. 256.

The decree of the Circuit Court is

*Affirmed.*