Hay, Judge,

reviewing the facts found to be established, delivered the opinion of the court:
The plaintiff which sues on behalf of itself and the officers and crew of the Manchester Engineer is the owner of the said ship, which is a steamship of 2,813 tons net register, 375 feet long, and is of steel and 40-foot beam construction, and at the time of the rendition of the salvage service hereafter mentioned was of the value of $240,000 and had aboard a cargo of the value of $575,000. She was commanded by Ernest W. Beggs, an experienced and competent navigator, and she had a competent crew consisting of 35 officers and men.
At the time of the rendition of the said salvage service the Winces, a torpedo boat, was owned and operated by the United States Government and, together with her supplies, was of the value of $60,000, and was manned by two officers and a crew of 30 men. On the 23d day of October, 1911, the Manchester Engineer was off the coast of North Carolina *453 proceeding on a voyage from Savannah to Manchester, England, via Norfolk, for bunker coal, when she sighted two torpedo boats belonging to the United States flying signals for assistance. One was the Macdonough, and she was towing the Wilkes. In the early morning of October 23, 1911, the Wilkes had become disabled by reason of the breaking down of her aft boilers, and both the port engine and the dynamo had become useless. She had been towed by the Macdonough from 7.35 a. m. to 5.30 p. m. on October 23, 1911, and at that time there was a fresh breeze blowing from the northeast, increasing to a gale. In the early morning of October 23 one of the Macdonough's towlines parted and at 5 p. m. the other towline of the Macdonough was about to part, and when the Macdonough sighted the Manchester Engineer at 5 p. m. she requested the Manchester Engineer to take the Wilkes in tow. The Wilkes also asked to be towed. The Wilkes was then in a bad condition; she was short of water, her port engine was out of commission, as was her dynamo, she had no electric lights, and water had begun to rise in her engine room. Upon the request of the Mac-donough and the Wilkes the Manchester Engineer proceeded to take the Wilkes in tow and from 6.30 to 8 p. m. October 23, 1911, the Wilkes and the Manchester Engineer were laboring to get a line attached. The first line broke, and at 9 p. m. another line was attached. At 10.05 p. m. this also broke. A moderate gale was blowing, and owing to the danger of the situation nothing was done until the next morning, the Wilkes having requested that the Manchester Engineer should stand by all night, which she did, as did the Macdonough, all three ships having drifted 24 miles during the night.
At 7.35 a. m. of October 24 a line was attached to the Wilkes, and the Manchester Engineer began towing her. The weather was very bad and continued so all day. The Macdonough steamed out of sight about 12.30 p. m. The towing continued all day, and was at all times against the sea, and in the faqe of the gale.
Measures were taken by the officers of the Manchester Engineer to have the towlines carefully watched, but at about *454 12.45 a. m. by the time aboard the Wilkes and at 1.45 by the time aboard the Manchester Engineer the towlines parted near the stem of the Wilkes. The engines of the Manchester Engineer were immediately slowed down. The steamer was then turned back on the opposite course and the lights of the Wilkes and those of another vessel, which was not very far from the Wilkes, were seen. The steamer followed these lights for 7 miles, until they disappeared inland toward Hatteras Cove. At the time the towlines parted the Wilkes was to the windward of Hatteras, and was in position to run before the wind to a safe anchorage, and was also near other naval vessels. When the towlines parted the steamer had towed the Wilkes about 72 miles against a northeast gale and heavy wind from an exposed position to one of comparative safety, to the windward side of Cape Hatteras, where the weather had moderated. After the lights of the Wilkes had disappeared the Manchester Engineer cruised around in search of the Wilkes until 6 o’clock in the morning, but as nothing could be seen of her the steamer steamed alongside the Diamond Shoal Lightship, and signaled that she had had the Wilkes in tow, and that she had broken adrift, and that the Manchester Engineer was proceeding to Norfolk. At Norfolk the master of the steamship made a verbal report to the United States navy yard of the salvage service, and later wrote a bi’ief statement of it, which he mailed to the commandant of the yard.
The Wilkes at the time the salvage service was rendered to her was in great danger, and great risk was incurred by the Manchester Engineer in rendering the service. The time employed in said service was a period of 40 hours, and the steamer was delayed in her journey 60 hours. By reason of the above facts the plaintiff on its own behalf, and in behalf of the officers and crew of the Manchester Engineer, brings this suit to recover salvage on account of services rendered by the Manchester Engineer to the torpedo boat Wilkes, owned and operated by the United States.
The defendants insist that the facts above recited do not show that the service rendered by the Manchester Engineer constitutes salvage service. We do not think the contention *455 of tbe Government can be maintained in the light of the facts and the law governing cases of this character.
There are three elements necessary to a salvage claim: (1) A marine peril to the property to be rescued; (2) service voluntarily rendered when not required as an existing duty or from a special contract; and (3) success in whole or in part, or that the service rendered contributed to such success. The Sabine, 101 U. S., 384.
There can be no question, under the facts in this case, that the WilJces was exposed to a marine peril at the time the services were rendered. She was on a stormy sea, disabled, with water rising in her engine room; and indeed, unless she had been in peril her commander certainly would not have asked assistance, nor would the Macdonough, her sister ship, have joined in that request and stood by all night and until it was seen that the Wilkes was safely in tow of the Manchester Engineer. To make out a salvage service it is not necessary to show that escape from danger by other means was impossible, provided the danger was real and imminent. “ It may be a case of more or less merit, according to the degree of peril in which the property was, and the danger and difficulty of relieving it. But these circumstances affect the degree of the service, not its nature.” The Connemara, 108 U. S., 352, 357. “Useful services of any kind rendered to a vessel or her cargo, exposed to any impending-danger and imminent peril of loss or damage, may entitle those who render such services to salvage reward.” The Blackwall, 10 Wall., 1, 11.
There was no contract between the parties in this case; the service was voluntarily rendered, and was not required as an existing duty from the Manchester Engineer to the Wilkes. The Manchester Engineer was requested to perform the service, and before rendering it exacted no conditions, and entered into no negotiations looking to payment for the service. To defeat the claim for salvage it must be shown that a contract to pay a given sum for the services to be rendered was entered into by the parties. It is not pretended in this case that any such contract was made, or that any contract of any sort was entered into. The Excel *456 sior, 123 U. S., 40, 49. There is no doubt that the service rendered by the Manchester Engineer to the Wilkes contributed to the saving of the latter and to her safe arrival in port. The fact that the Wilkes was in an exposed position from which she was towed to a.place of comparative safety, and that she afterwards reached port, is proof positive that the Manchester Engineer contributed to that end and to the saving of the vessel. The fact that some other ship also contributed to the saving of the vessel will not defeat the claim of the plaintiff for salvage. “ More than one set of salvors, however, may contribute to the result, and in such cases all who engage in the enterprise and materially contribute to the saving of the propery are entitled to share in the reward which the law allows for such meritorious service, and in proportion to the nature, duration, risk, and value of the service l’endered.” The Blackwall, 10 Wall., 1, 12.
In this .case the Manchester Engineer materially contributed to the saving of the Wilkes, and performed the service at great risk and inconvenience to herself at a time when the danger to the Wilkes was most imminent.
As to the amount of the award in salvage cases, Barney, Judge, in delivering the opinion of this court in the case of The Alaska Exploration Co. v. United States, 44 C. Cls., 392, 396, quoting from the opinion of the court in the case of The Blackwall, 10 Wall., 1, says: “Courts of admiralty usually consider the following circumstances as the main ingredients in determining the amount of the award to be decreed for a salvage service: (1) the.labor expended by the salvors in rendering the salvage service. (2) The j)romptitude, skill, and energy displayed in rendering the service and saving the property. (3) The value of the property employed by the salvors in rendering the service and the danger to which said property was exposed. (4) The risk incurred by the salvors in securing the property from the impending peril. (5) The value of the property saved. (6) The degree of danger from which the property was rescued.”
In estimating the amount of salvage to be allowed the court must be guided by the circumstances pertaining to the case under trial, and must exercise its best discretion in the light of the rule above given. We think in this case *457 that a judgment should be awarded in favor of the plaintiff for the sum of $17,500. As to its apportionment we think $10,000 should be awarded to the owner of the vessel. As the vessel in this case was a steamship of large size and great value we have allowed the owners more than one-third of the amount awarded. The Comanche, 8 Wall., 448, 473. Seven thousand five hundred dollars should be awarded to the officers and crew, the latter amount to be paid to the officers and crew in proportion to the wages they were receiving, and as there is no evidence in the record showing what the wages of the officers and crew were the case will be referred to one of the auditors of this court to ascertain and determine the amount of wages received by each officer and each member of the crew, and when that is done a judgment will be entered in accordance with the report of the auditor in favor of the aforesaid officers and crew.
Judgment will be entered in accordance with the views above expressed.
DowNey, Judge; BarNey, Judge; Booth, Judge; and Campbell, Chief Justice, concur.