### THE OLOCKSON.

### FALK et al. v. UNITED STATES SHIPPING BOARD EMERGENCY FLEET CORPORATION et al.

(Circuit Court of Appeals, Fifth Circuit.   June 20, 1922.)

No. 3836.

I. Salvage ⬅══34—Master and crew of government tug held entitled to award for saving another government vessel; award held not excessive.

A government tug, towing in the Canal, was sent to the assistance of a Shipping Board steamship on fire 120 miles west of Panama, near the coast, under positive instructions not to attempt to tow her to port; the only alternative being to tow her into shoal water and sink her. When the tug arrived, she had been abandoned by master and crew, who were on a cruiser and refused to return; the master desiring the cruiser to blow up and sink the steamer. Two of the tug's crew went on board and secured a towline, after which the master of the tug obtained permission by wireless to attempt to save her, and towed her to port, saving the cargo, worth $178,000, and the ship, worth in damaged condition $100,000. There was some evidence, but not conclusive, of an agreement by the marine superintendent of the Canal that the tug should be paid for towage and not salvage services. *Held* that, in any event, the salvage service was volunteered by master and crew to an abandoned vessel, and was

⬅══For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

highly meritorious, and that an award to them of $15,000, as salvage compensation, was proper, and not excessive.

2. Salvage ⬙48—Burden of proving contract on vessel owner.
   The burden is on the owner of a salved vessel to prove a contract fixing the amount of salvage.

3. Salvage ⬙18—Crew of public vessel entitled to salvage compensation.
   The crew of a public vessel is entitled to compensation for salvage services.

4. Salvage ⬙3—Government tug, engaged in towing for hire, held a merchant vessel.
   A tug owned by the United States, but employed in towing vessels in Panama Canal, held a merchant vessel in respect to salvage services rendered.

5. Salvage ⬙16—Crew of vessel under contract may be entitled to salvage award.
   That a vessel has been employed for a service for a fixed compensation does not prevent her crew from being awarded salvage for meritorious services not contemplated by the engagement.

6. Salvage ⬙18—Crew of government vessel may recover for salvage services for saving government vessel.
   That the United States is the owner of both salved and salving vessel does not prevent a claim of salvage by the crew.

   Walker, Circuit Judge, dissenting.

Appeal and Cross-Appeals from the District Court of the United States for the Canal Zone.

Suit in admiralty for salvage by Leopold Falk and others against the United States Shipping Board Emergency Fleet Corporation, owner of the Steamship Olockson, and Thomas Endresen, claimant of cargo. From the decree, all parties appeal. Affirmed.

William C. MacIntyre, of Ancon, C. Z., and George Terriberry and Joseph M. Rault, both of New Orleans, La. (Todd & MacIntyre, of Cristobal, C. Z., and Terriberry, Rice & Young, of New Orleans, La., on the brief), for appellants and cross-appellees.

A. C. Hindman, Sp. Asst. Atty. Gen., of Christobal, C. Z., for appellee and cross-appellant. U. S. Shipping Board Emergency Fleet Corporation.

James W. Ryan, of Buffalo, N. Y., and T. Catesby Jones, of New York City (Chauncey P. Fairman and Bigham, Englar & Jones, of New York City, on the brief), for appellee and cross-appellant Endresen.

Before WALKER, BRYAN, and KING, Circuit Judges.

KING, Circuit Judge. This case arises on a libel filed by Leopold Falk, chief engineer and a member of the crew of the tug Gorgona, in behalf of himself, the captain, and crew of said tug, against the United States Shipping Board Emergency Fleet Corporation and the steamship Olockson and its cargo, to recover as salvors for saving said steamship and cargo. Said steamship Olockson was a merchant vessel, the property of the United States, controlled by the United States Shipping Board Emergency Fleet Corporation, and being operated by

the Barber Steamship Lines, Incorporated. The vessel was claimed by said Shipping Board, and the cargo by the master of the Olockson as agent of the owners. The libel proceeded against the Shipping Board on the principles of a libel in rem, but seeking relief in personam under the provisions of the Act of Congress of March 9, 1920 (41 Stat. 525, 527), so permitting. The value of the cargo was agreed to be $178,000, and was released on bond.

[1] The tug Gorgona belongs to the United States as property of the Panama Canal, and is used in the assistance of vessels passing through the same, when in need, for compensation usually agreed on. Her usual compensation was $25 per hour for towing service. Said vessel Olockson, with a cargo of gasoline and rails, bound for the Orient, after passing through the Panama Canal, was reported by wireless to be on fire by the captain of the United States cruiser Tacoma, which had her crew aboard. He also reported that he considered it unsafe to tow the Olockson with the Tacoma. The Olockson was reported to be 120 miles west of Panama and 24 miles southwest of Cape Malo. The tug Gorgona, of the Panama Canal, was sent to her assistance. On leaving the port of Balboa, her master was given positive orders by Marine Superintendent Sargent not to attempt to round Cape Malo with the Olockson. Rounding this cape was necessary to bring the Olockson to Balboa. The only alternative was to tow her to shoal water and sink her, out of the path of commerce. The master and crew of the Olockson had abandoned her, and the master refused to order any one to go aboard to fix a towline. He thought she should be shelled and sunk, and had requested authority for the Tacoma to do this from the naval authorities. The captain of the Tacoma refused to shell the Olockson without such authority.

The master of the tug was unwilling to order any of his crew aboard the burning Olockson, in order to make fast a towline. However, he maneuvered the Gorgona to windward of the Olockson and in touch with her, when two of the tug's crew, of their own volition, without orders, sprang on board the Olockson and made fast a towline. The master of the tug Gorgona then of his own initiative sought permission by wireless, through the captain of the cruiser, to attempt to tow the Olockson, still on fire, to Balboa, where she could be saved. He finally secured permission to use his discretion to carry out any request made by the master of the Olockson as to disposition of that vessel.

From the evidence it would seem that the idea of making salvage of the vessel or cargo originated with, and was due to, Capt. Howard, the master of the tug, and was accepted finally by the master of the Olockson, who then requested it, and that the towage, and finally the salvage, was rendered possible by the gallantry of the two members of the tug's crew, who acted on their own initiative after the crew of the vessel in peril had refused to do anything. Before this, the idea of every one seemed to have been the destruction of the vessel, in such a way as to prevent her becoming a menace to commerce, and the necessary total loss of the cargo. The orders given by the marine superintendent did not contemplate towing the vessel to port, and his consent to withdraw his order not to round Cape Malo was due to the initiative

and request of the tug's master, which the voluntary gallantry of the two members of her crew rendered possible.

In withdrawing this prohibition, the marine superintendent did not continue to direct the movements of the tug or its crew; he did not order that they should carry out the requests of the master of the Olockson; he committed to the discretion of the master of the tug, Capt. Howard, the entire responsibility for, and power to direct, the conduct of the Gorgona in this regard. After that the actions of the Gorgona and her crew were apparently undertaken by Capt. Howard on his own responsibility. Had he, in the exercise of this discretion, refused to tow the Olockson, he could have properly done so. If he improperly towed her and endangered the tug, it would have been his default, and not the carrying out of the orders of another.

[2] It is insisted that the Gorgona was proceeding to the assistance of the Olockson under an express contract fixing the compensation to be paid for all services of herself and crew. Upon the news of her condition being received, an official of the Panama Agencies, which company, as local agents, handled all Shipping Board vessels, called up the marine superintendent of the Canal and asked him to send the tug Gorgona to the assistance of the Olockson. There is some evidence that this official of the Panama Agencies said to the superintendent, "I suppose this will be $25," and asked said superintendent whether there would be any salvage in the matter; the superintendent replying that as far as he was concerned he did not see there was. It was stated this was an off-hand inquiry, made jocularly and a laughing reply. The burden is on the vessel's owner to prove a contract fixing the amount of salvage. 35 Cyc. 758.

Here there appears to have been no definite contract, except the statement of the marine superintendent that, so far as he was concerned, the usual charge of $25 per hour would be sufficient, and he would ask no salvage. While this might fix the compensation for the use of the tug for towage service, we do not think it amounted to a contract which would exclude the claim made by the crew in this case.

Even if it be conceded that the tug was sent out under an engagement for a fixed compensation, it would seem that the service which her master and crew rendered was far more than, and was different from what, was originally intended. When the Gorgona reached the Olockson, it found that, instead of being expected to aid that vessel, the vessel had been abandoned by her master and crew; that, instead of being called on to tow the vessel, her master and crew refused to take the steps necessary to tow her, and abandoned all efforts to save her to the tug and her crew. The situation thus existing was entirely different from the aid afforded by a tug to a disabled vessel, and became one of saving an abandoned vessel.

"The true criterion by which it is to be ascertained whether the towing vessel has become a salvor is whether the supervening circumstances were such as to justify her in abandoning the towage contract. Thus, an engagement to tow embraces the risk of ordinary weather only; and so, where a violent hurricane arises, so as to justify a tug in abandoning the contract, and she at great peril to herself continues to tow the vessel during the hurricane without interruption, though taking longer, prevents the vessel drifting upon

the shore, and brings her to her destination safely, the services are salvage. Negligence of the tow placing her in a position of peril transforms into salvage rescue services thereafter rendered by the tug. In no instance is it absolutely essential that the tug be also imperiled. So where, by the breaking of a ship's hawser, the ship is placed in danger not occasioned or contributed to by the tug, a towage contract is so far suspended as to entitle the tug to a larger remuneration under the head of salvage." 24 R. C. L. 1444.

[3] Whether the tug be strictly a merchant vessel or a quasi public vessel, her crew are not, by reason of any agreement as to compensation or her character, debarred a reward by way of salvage for the responsibility which the master assumed and efforts of himself and crew, which resulted in the saving of the cargo and of the vessel, in its damaged condition, both of which otherwise would have been totally lost. It has never been held that the crews of public vessels are not to be compensated in any case by way of salvage. 35 Cyc. 736; Robson v. Huntress, 20 Fed. Cas. 1060, 1062, No. 11,971; The Josephine, 13 Fed. Cas. 1150, 1152, No. 7,546.

[4] But we think that this vessel, while owned by the United States, should be classed as a merchant vessel. She was engaged in the aid of commerce, for hire, and was under no duty to go to the relief of the Olockson, any more than a vessel owned by private persons engaged in the same line of business. She was wholly unlike a fire department extinguishing a fire, the very business for which it was maintained and paid.

[5] That a vessel has been employed for a service for a fixed compensation does not prevent her crew from being awarded salvage for meritorious services not contemplated by the engagement. The existence of the contract is but an element to be considered in fixing the amount to be awarded for the unexpected service. The Excelsior, 123 U. S. 40, 50, 8 Sup. Ct. 33, 31 L. Ed. 75; 35 Cyc. 720, 725. That the crew are employed by their own vessel for fixed wages is a fact which exists in every case where salvage is allowed, and is not a barrier to an award of salvage, where the service performed was extraordinary as in this case.

The work was arduous, involved constant labor, and with more or less risk, for a long and continuous period, and resulted in the saving of cargo of the agreed value of $178,000, and of a vessel, which in the original answer of the claimant is admitted to be worth, in its damaged condition, $100,000. It is reasonably certain that, but for the action of the captain and crew of the tug, both would have been lost.

The award of $15,000, as against cargo and vessel, is not so excessive as to call for its reversal. The division between the cargo and the vessel is one of which the claimant of the cargo cannot complain. There is no proof which shows that the vessel in its present condition is worth any more than $100,000, and the court was warranted in adopting the figure originally fixed by the claimant of the vessel as its value.

[6] That the United States is the owner of both the vessel and the tug does not prevent the claim of salvage. Rees v. United States (D. C.) 134 Fed. 146; Jacobson v. Panama R. Co. (C. C. A.) 266 Fed. 344, 346.

We therefore conclude that the decree of the District Court should be affirmed.

WALKER, Circuit Judge (dissenting). Upon the local agent for the Isthmus of the owner of the Olockson learning that that vessel was on fire at sea, he made a contract with the marine superintendent of the Panama Canal, the authorized representative of the owner and operator of the tug Gorgona, which was not then in port, for that tug to go to the aid of the burning ship; the understanding being that $25 an hour was to be paid for the services of the tug and its crew, whether the service rendered was successful or not. The owner of the tug sent in its bill for the service rendered, charging $25 an hour from the time the tug left Balboa until it returned to that place with the burning ship in tow. That bill was paid by or for the owner of the ship. There was no evidence of any change or modification of the above-mentioned contract. Several hours after the contract was made the tug returned to Balboa, and during the evening of that day put to sea to go to the aid of the Olockson, after the marine superintendent gave orders to the captain of the tug, which indicated that the marine superintendent did not then contemplate the towing of the Olockson back to Balboa.

The terms of the contract, considered in the light of the circumstances attending the making of it, plainly show that a rescue or saving of the whole or a part of the Olockson or its cargo was a service covered by that contract. Obviously it was contemplated that a salvage service would be rendered, if it was found to be reasonably practicable to render it. It does not seem to the writer that the fact that, when performance of the service was actually entered upon under the previously made contract, the representative of the tug owner did not expect the ship to be saved, and gave orders accordingly, can properly be given the effect of making the salvage service rendered one not covered by the contract. The fact that the tug owner, after the contract was made and without the knowledge or consent of the other party thereto, adopted a plan of action which, if carried out, would not have resulted in saving the ship or its cargo, in whole or in part, does not keep the salvage service actually rendered by the tug and its crew from being one governed by the contract, so far as payment for it is concerned.

Though a service is one which helps to save a vessel endangered at sea, a valid contract by one party to pay at all events, and by the other to receive, either a fixed or a reasonable compensation for such service, is as conclusive as any other contract. The Parisian (C. C. A.) 264 Fed. 511; The Elfrida, 172 U. S. 186, 19 Sup. Ct. 146, 43 L. Ed. 413. If such a service, so contracted for, is that of a tug and its crew, the party contracting for that service is deprived of the benefit of his contract if he is held to liability, not only to the other party to the contract for the compensation agreed to be paid to the latter for the service, but also to the latter's employees for a salvage award for the same service so far as they participated in rendering it; such award and the amount of it to be based on the false assumption that there was a

voluntary rescue, not covered by any contract, which would have gone unrewarded, but for the success of the effort.

The service rendered being one covered by the contract; and the agreed compensation therefor having been paid, in the opinion of the writer the award in favor of the crew of the tug cannot be sustained, because the contract price, which has been paid, covered the services rendered by the crew.