KITTELSAA et al. v. UNITED STATES.

THE MONTAUK POINT.

No. A-18044.

District Court, E. D. New York.

Feb. 26, 1948.

Burlingham, Veeder, Clark & Hupper, of New York City (John L. Belford, of New York City, of counsel), for libelants.

J. Vincent Keogh, U. S. Atty., of Brooklyn, N. Y. (Max Taylor, of New York City, of counsel), for respondent.

BYERS, District Judge.

This is a salvage cause in which the officers and crew of the Motor Vessel Montauk Point (seagoing tug) seek an award for salvaging the S. S. Abraham Baldwin, a steel screw steamship owned by the United States, of 7,176 gross and 4,380 net tonnage, 422.8 feet by 57 feet, on May 19, 20, and 21, 1946.

The services are admitted in general, and the case for the Government is, first that they were rendered by the libellants while the latter were attached to the government-owned Montauk Point which was being operated by Moran Towing Company, and were involuntary in that they were such as under their Articles the libellants were required to render to another government-owned ship; and second, if the foregoing is not efficacious to defeat

the claims, then the award must be very modest because the operation was merely that of towage. In other words, the Court is required to minimize what was accomplished by way of safely bringing into port a steamship which had been abandoned at sea, having an agreed value, for present purposes, of $556,766.00

As to the first argument, it is to be understood that the claim is not advanced by Moran. It is therefore unnecessary to decide whether that company was required to send the Montauk Point to the assistance of the Baldwin under the terms of its general agency contract, Article 10 of which clearly contemplates that salvage claims may arise for services rendered to vessels, both those owned or controlled by the United States, and those which are not.

Moreover, Moran did not send the Montauk Point to the Baldwin.

■ There is authority for the view that the common ownership of these vessels is not of itself a reason for denying to salvors a fair reward for their services: The Olockson, 5 Cir., 281 F. 690, 694, in which two government vessels were involved. It also declares that the employment of a vessel for a fixed compensation (the Montauk Point) "does not prevent her crew from being awarded salvage for meritorious services not contemplated by the engagement. The existence of the contract is but an element to be considered in fixing the amount to be awarded for the unexpected service. The Excelsior, 123 U.S. 40, 8 S.Ct. 33, 31 L.Ed. 75 * * *."

See also Jacobson et al. v. Panama R. Co., 2 Cir., 266 F. 344, at page 346.

■ This question of law being necessarily resolved against the respondent, it becomes necessary to consider the nature and extent of the salvage services which were performed, in order to essay a fair valuation thereof.

■ It may be said at once that the difference between a mere towage and salvage has been pointed out by Judge Addison Brown in this language: "A salvage service is a service which is voluntarily rendered to a vessel needing assistance, and is designed to relieve her from some distress or danger either present or to be reasonably apprehended. A towage service is one which is rendered for the mere purpose of expediting her voyage, without reference to any circumstances of danger." McConnochie et al. v. Kerr et al., D. C., 9 F. 50, 53.

■ Since the Baldwin was bound to Philadelphia from New York, it cannot be argued with even a trace of plausibility, that bringing her back to her port of departure was a service rendered to expedite her southbound voyage in any proximate sense.

These questions being thus disposed of, and to avoid repetition, the recital of the pertinent facts as to the salvage service will be set forth in the following:

Findings

(1) The S. S. Abraham Baldwin, light, was bound from New York to Philadelphia on May 19, 1946, and at about 12:27 A. M. (N. Y. time) was in collision with the S. S. Santa Olivia off the coast of New Jersey, about 28 miles south of Ambrose Lightship, and perhaps 6 or 7 miles easterly from Beach Island which forms the seaward barrier of Barnegat Bay, about opposite Sea Side Heights.

(2) The damage suffered by the Baldwin was a hole stove in her starboard side in the way of the number 2 hold, at the water-line, extending above and below, which was 6 feet in its fore and aft dimension. That hole admitted sea water into holds 2 and 1, which filled to sea level in a short space of time; the ship soon developed a list of between 30° and 35°.

(3) At about 12:40 A. M. the Master ordered all hands to abandon the ship and take to the life-boats because he considered the vessel to be in a very dangerous condition. That order was executed and the ship was abandoned by her Master and crew, shortly after 1:00 A. M.

(4) The life-boats stood by at a distance of about 100 yards to see if the Baldwin was going to turn over, but gradually the boats drifted away in a westerly direction and finally sight of the Baldwin was lost.

(5) The Santa Olivia stood by, and was boarded by the Master and crew of the

Baldwin about one hour after the latter had been abandoned.

(6) A condition of intermittent fog prevailed so that the Santa Olivia's searchlight was not able to keep the Baldwin in sight continuously between the time of collision and daylight, for she was lost to view at least twice.

(7) At the time of the collision and until about 11:00 A. M., the sea was smooth, with a light wind out of the northeast (Force 2 to 3), and visibility varied according to the density of the fog which prevailed.

(8) At about 6:30 A. M. the ocean tug Montauk Point, bound for New York from Hampton Roads, observed the Baldwin and the Santa Olivia, and altered her course to the westward to ascertain existing conditions.

(9) At that time the Baldwin had drifted in a generally southerly direction from the point of collision, at about ½ mile per hour, to the vicinity of the fish weirs later to be identified.

(10) The Master of the tug came close enough to the Baldwin to observe the hole in her side, and her list to starboard, and that she seemed to have been abandoned. At that time or promptly thereafter, the Santa Olivia was seen to be casting adrift an empty life-boat, and about to proceed on her way; the Montauk Point came alongside and learned that all hands had been taken on board the Olivia from the Baldwin because of the danger of the latter's sinking, and that the Olivia was proceeding to New York. The tug undertook to render assistance to the Baldwin and to notify her Master (aboard the Olivia) if that should prove to be possible.

(11) At about daybreak an effort had been made by the Master of the Baldwin to return and board her, with a volunteer crew of 10 or 12, in one of the Baldwin's life-boats; they returned to that vessel but only the boatswain succeeded in making his way aboard the ship, although the Master tried and failed. The boatswain was ordered back into the life-boat after he had crawled along the deck on his hands and knees to about the No. 4 hatch. The others in the boat were fearful that the Baldwin would capsize, as was the Master; she was "lurching and rolling to a certain extent", and all hands decided that they didn't want to go aboard. The life-boat then returned to the Olivia.

(12) The Montauk Point returned to the vicinity of the Baldwin and observed that she had then drifted shoreward to a position nearly in line with certain fish weirs off Island Beach Coast Guard Station, which extended easterly into the Atlantic Ocean about ¾ of a mile, from a line drawn north and south about ¼ of a mile off Island Beach.

(13) At that time (about 7:00 A. M.) the Baldwin was drawing 9½ feet aft and 18½ forward, and her list to starboard was from 30° to 35°, and the soundings showed 14 fathoms.

(14) The Montauk Point proceeded, after a period of observation, to anchor in a position ahead of the Baldwin, not alongside for fear of her capsizing. The Master ordered the Chief Engineer, the Second Officer, and five seamen to take to the life-boat and row to the Baldwin and board her. This order was executed while fog prevailed to such an extent that the life-boat was lost to sight from the Montauk Point.

Boarding of the Baldwin was accomplished, the libellant Kittelsaa being the first man up; the Second Officer and then the other men in the life-boat followed him.

The list was verified, and soundings taken at the bow of 6 fathoms. Then the port anchor of the Baldwin was dropped from her hawse-pipe to arrest her drift. It was necessary to ring the ship's bell to apprize the Montauk Point of the Baldwin's position, and to facilitate taking aboard a 250 fathom 12 inch manila hawser which had been broken out aboard the tug in anticipation of its use.

That hawser was taken aboard with the use of small tackle, on the starboard side, and was made fast to the forward bitts; a chafing gear was rigged on it, and then the Montauk Point pulled ahead to run out the anchor chain of the Baldwin to the bitter end which was released, since there

was no power on the ship to employ in hoisting the anchor.

At this juncture all hands were ordered back to the life-boat which pulled clear to avoid the possible effect of a greater starboard list which was anticipated in connection with freeing the port side at the bow, from the pull of the anchor chain.

The officers and crew then pulled back to the Montauk Point around the stern of the Baldwin, down the fish weirs, and so to the tug.

(15) The tug's position was then taken, as per radio direction bearings and soundings, to be 39° 53′ 30″ north latitude, and 74° 4′ west longitude.

(16) With the Baldwin thus in tow, the Montauk Point proceeded under slow speed, and through intermittent dense fog, toward New York. The tug sent radio warnings to all ships and stations that she had a ship in tow that might endanger other navigation.

(17) The Baldwin towed broad off the starboard quarter on full hawser until evening when she began to sheer back and forth, probably because of currents, nearing the Ambrose Ship buoys; this required rigging chafing gear on the hawser.

(18) Sea towing ended about 7:50 or 8:00 P. M., when arrival was had off Ambrose Channel.

(19) The Montauk Point had been in radio communication with Moran as early as 7:30 A. M. on that day, reporting that she was standing by the Baldwin and attempting to get alongside. By answer she was instructed, by message filed at 7:55 A. M., to stand by and endeavor to tow the Baldwin to New York.

(20) The salvage vessel Accelerate, of the Merritt, Chapman & Scott fleet, had been ordered early in the day to find the Baldwin and render assistance, but had been deterred in that effort, and did not reach the ship or the Montauk Point until about 7:25 P. M. when she drew alongside the latter and learned that there was no one aboard the Baldwin. Then her salvage officer (Shepherd) in a motor launch went to the Baldwin and aboard with a life-boat crew at 7:40 P. M.

(21) He found the hole in her side, and that holds Nos. 2 and 1 were filled to sea level, that she had a 35° list to starboard, and was down by the head so that her draft was 23 feet forward and 9 feet aft. Other cargo holds were dry, namely, Nos. 3, 4 and 5, as were the engine and fire rooms.

It would have been quite difficult for her own crew to navigate her; she would have needed the assistance of two or three tugs to have been brought in.

(22) About 1:00 A. M. of May 20, 1946, the Accelerate put out a line to the stern of the Baldwin to keep her steady, she being then on her tow-line to the Montauk Point which was herself anchored.

(23) On the 20th the Accelerate rigged three pumps aboard the Baldwin, and pumping continued until May 22nd at about 1:30 P. M., when she was taken, still in tow to the Montauk Point, on her way to Pier 6, Hoboken. She was moored alongside the pier and by then was on an even keel and drawing 12½ feet forward and 13 feet aft, as the result of the pumping operations.

(24) The men from the Accelerate handled all lines on the Baldwin, including the towing hawser from the Montauk Point.

(25) On May 20th the rope hawser carried away in an effort to swing the tow, and a steel cable had to be rigged at the stern of the Baldwin, so that part of the trip through Ambrose Channel and up to the pier, she was towed stern first. The completion of the towing was interrupted by fog, and it was necessary to anchor off Norton's Point, apparently on the night of May 20th. On the next day the Montauk Point was assisted by other Moran tugs in completing the trip to Hoboken.

(26) The following elements are deemed to enter into a computation of the value of the salvage services:

(a) Risk of salvors: This is confined to the services of the boarding crew recited in Findings 14, 15 and 16. The peril to which they seemed to be exposed was that the ship might capsize and cast them into a smooth sea, from which rescue would be anticipated in view of the situa-

tion as outlined. There was some danger, but not such as to strike terror to those who follow the sea.

There was little hazard attending the towing operation itself, save the danger of collision with other vessels, the tug being hampered by her tow; this was reduced to a minimum by the giving of radio warnings.

(b) Danger to the Baldwin between the time of her abandonment and the rendition of the salvage services. This element was present, for she probably would have stranded, with the prospect of straining her structure and perhaps inviting damage to her engines and equipment. That danger was averted, and while it was not of great magnitude, it must be reckoned with.

(c) Value of salved property is stipulated to have been $556,766, for present purposes.

(d) Value of salvor tug likewise similarly stipulated at $300,000. Since no claim is made on her behalf, it is thought that this element is not pertinent to the calculation. Her charter rate is $2,500 per day, which is some indication of her earning capacity, but not otherwise of moment.

(e) Time, labor and expense incurred by salvors. The latter element is not present; no unusual labor was involved, and the time of the operation is that which elapsed between May 19th at about 7:00 A. M. and May 22nd at about noon; during the last 2½ days, however, other vessels and their crews rendered services which considerably enter into the computation to be made.

(f) Promptitude, and skill. All services were well and adequately performed according to the requirements of the situation.

(g) Success of operation. That this was achieved, and that the Baldwin was saved intact is not contested.

(h) Abandonment of the Baldwin by her Master and crew. This act was complete and unequivocal, and was confirmed by the result of the visit made by her Master and volunteer crew, referred to in Finding 11.

The vessel thereby became a derelict. The Laura, 14 Wall. 336, 81 U.S. 336, 20 L.Ed. 813, and citations thereof.

### Conclusion

The reasonable value of the salvage services is $15,770, with interest from May 19, 1946, to be apportioned to the libellants according to their monthly wage, double shares to be paid to the Master and members of the boarding party.

### Theory of the Award

This entire operation would not loom high on a scale, if one were available, of comparable labors in the rendition of salvage services. While a percentage basis of computation is a makeshift at best, it seems evident that the value of the property which is rescued from threatened danger must be reflected in the attempt to fairly appraise the value of what is so accomplished in efforts which lie beyond the scope of contractual duty.

Awards in other cases, in which the salvors displayed sheer heroism in the face of imminent bodily peril, serve to dilute any formula of computation to the moderate requirements of just reward in this case. I have deemed 5% of the salved value to represent a fair basis for all services of libellants involved in bringing the Baldwin safely to her pier. The contribution of the Accelerate and the other Moran tugs being deducted (as stated in libellants' brief) leaves the figure fixed for the above award to the libellants.

Settle decree in accordance with the foregoing.