42 F.2d 524 (1930)
THE SHREVEPORT.
STRACHAN SHIPPING CO.
v.
CITIES SERVICE REFINING TRANSPORT CO.
District Court, E. D. South Carolina.
June 3, 1930.
*525 Adams, Adams & Douglas, of Savannah, Ga., Bigham, Englar, Jones & Houston, of New York City, and Barnwell & Black, of Charleston, S. C. (T. Catesby Jones, of New York City, and N. B. Barnwell, of Charleston, S. C., of counsel), for libelants.
Barry, Wainwright, Thacher & Symmers, of New York City, and Huger, Wilbur, Miller & Mouzon, of Charleston, S. C. (A. Huger, of Charleston, S. C., and Earle Farwell, of New York City, of counsel), for respondent.
Cutting, Phillips & Hall, of New York City, and Edward W. Hughes, of Charleston, S. C. (W. B. Hall, of New York City, of counsel), for interveners.
Kirlin, Campbell, Hickox, Keating & McGrann, of New York City, and Buist & Buist, of Charleston, S. C. (George L. Buist, of Charleston, S. C., of counsel), for the Aldecoa.
ERNEST F. COCHRAN, District Judge.
This is a suit against the steamship Shreveport for salvage services.
The original libel was filed by the Strachan Shipping Company, as charterer, on behalf of itself and of the master, crew, and owner of the steamship Mariners Harbor against the Shreveport. The Shreveport was seized by the marshal and thereafter released upon the filing of a bond in the sum of $150,000. After the release of the vessel, the United Navigation Company, Inc., the owner of the Mariners Harbor, filed an intervening libel. The Cities Service Refining Transport Company appeared as claimant of the Shreveport. Subsequently, Francisco Aldecoa, in his own behalf, as owner and master and on behalf of the officers and crew of the steamship Aldecoa, petitioned to be allowed *526 to intervene as life salvors, claiming to be entitled to a fair share of any salvage award which might be allowed. The claimant made no objection to the motion for intervention on the part of the Aldecoa, but the intervention was resisted by the original libelants on the ground that the vessel had already been released under bond. The court allowed the intervention, reserving nevertheless all questions as to the rights of the Aldecoa until the hearing upon the merits. Subsequently, Constantino Madias, first mate, Elie C. Carayanis, second mate, Michael P. Bonicos, chief engineer, and certain other members of the crew of the Mariners Harbor, were permitted by the court to file intervening libels for their own interests.
The Shreveport is an American oil burning tank steamer; built at the Alameda plant of the Bethlehem Ship Building Company, in 1918; 435 feet long, 56 feet beam, 32 feet depth, equipped with Scotch boilers and triple expansion reciprocating engines. Her dead weight tonnage was 10,050. She was equipped with a Sperry gyro compass and Sperry automatic steering device. At the time of the salvage services, she was on a voyage, in ballast, from Philadelphia to Port Neches, Tex.
The Mariners Harbor is a coal burning cargo steamship with a dead weight capacity of 3,535 tons; 264 feet long, 42 feet 2 inches beam, and 21 feet 9 inches depth; equipped with triple expansion engines, and was built at Staten Island, N. Y. At the time of the salvage services she was under charter from her owner to the Strachan Shipping Company; had a crew of 28 altogether, including captain, officers, and men; and was on a voyage from Norfolk, Va., to Brunswick, Ga., under command of Capt. J. F. Swenson.
The Aldecoa is a steel screw steamship of 6,089 tons gross register; 358 feet long, 48 feet beam, 32 feet depth; and at the time of the salvage services was on a voyage from Philadelphia to Boca Grande.
The Shreveport left Philadelphia on September 10, 1928. Nothing unusual occurred until September 12, 1928, when about 10 a. m. several explosions occurred in the vessel's cargo tanks, while she was in the vicinity of Frying Pan Shoals buoy. At the time of the explosions, she was proceeding at about 10½ knots, which was her full regular traveling speed, though she could have been pushed more. Immediately after the explosion, fire and smoke came from tanks 3 and 4. The fire raged fiercely, and the ship and her crew were in imminent danger, because of the possibility of gas in the tanks and of the proximity of the flames to the open hatches of No. 7 tank. The chief officer was killed, and the second mate was so badly injured that he died shortly thereafter; and the master, steward, and cook received severe injuries. The third officer sustained contusions and broken ribs, and the boatswain was missing  supposed to have jumped or been blown overboard. About twenty or thirty minutes later, the Aldecoa came in sight, and, on observing the fire, immediately changed her course and proceeded toward the Shreveport. The Shreveport's third officer, when he saw the Aldecoa approaching, sent one of his officers to blow the whistle to make sure that the Aldecoa would know that the ship was in distress. In the meantime, owing to the fierceness of the fire, and the great danger of another explosion, which might burst the ship asunder and destroy the crew, it was decided to leave the Shreveport, and the surviving members of the crew had been mustered on the stern of the ship under the command of the third officer. The lifeboats had been swung out on the davits, but had not been launched. On approaching the Shreveport, the officers of the Aldecoa saw the men upon her decks, and, when about two miles distant, saw them getting into the lifeboats. Having made sure that the Aldecoa was coming to the rescue, the third mate searched the living quarters for survivors, and got his men into the lifeboats, leaving the davits hanging. The Aldecoa came to within 200 metres of the Shreveport and stopped there to take the survivors on board. The survivors included a number of injured men, among whom was the second officer, who died just after the doctor came on board at the quarantine station at Southport. The master of the Shreveport also was badly injured, and it was doubtful whether he would live. It was determined that the injured men should be carried forthwith to the nearest port, but that search should be made first for the missing man. The master of the Aldecoa placed his vessel, for these purposes, at the disposition of the Shreveport. Search was made for the missing man for some time, but without avail; and the Aldecoa then proceeded to take the crew to Southport, N. C., and, after delivering them safely there, proceeded on her voyage to Boca Grande. The missing man referred to was later picked up that night by the Clyde liner Mohawk, but afterwards died as the result of the exposure he had undergone.
*527 While aboard the Aldecoa, the master of the Shreveport sent the following radio to her owner:
"Citranco, New York. At 9.55 steamer exploded amidships, fire started, expect more tanks to explode, necessary to abandon ship, position two miles southwest Frying Pan Shoal Buoy. First officer, engine pumper and boatswain lost. Captain, second officer and steward burned. Picked up by Spanish SS `Aldecoa' who will disembark us at Wilmington (Carolina) please advise revenue cutter to be alongside `Shreveport.' Signed, Simmons, Captain."
When the crew of the Shreveport left her, the fire on the vessel was still raging, and the vessel was in a perilous situation. She was not only in danger from the fire and further explosions, but she was near Frying Pan Shoals, an exceedingly dangerous portion of the coast, and might go upon the shoals and be lost. She was also in the lane of the coast-wise commerce and was a peril to navigation. About 3 p. m., the Mariners Harbor sighted the Shreveport, saw that she was on fire, and immediately changed course and bore down for her. At the same time, a Dutch vessel apparently sighted the Shreveport also, for she changed her course and proceeded towards the Shreveport, but the Mariners Harbor arrived first, and the Dutchman passed on and never stopped. As soon as the Mariners Harbor was within hailing distance of the Shreveport, she blew her whistle several times to attract attention, but failed to get any reply. Capt. Swenson, the master of the Mariners Harbor, suggested the advisability of sending a party on board the Shreveport to ascertain if there were any living persons in the cabin, but he left it to the crew to volunteer for this service. The whole crew were perfectly willing to undertake the service. Capt. Swenson thereupon designated five members of the crew and sent them to the burning tanker. These men were Constantino Madias, chief mate, Elie C. Carayanis, second mate, Michael P. Bonicos, chief engineer, and Vincent Finch and Frank Hagan, able seamen. For convenience, these men will hereafter be referred to as the boarding party. At this time, the fire was still burning very strongly amidships, the flames shooting up through dense smoke; at some places, the side of the vessel was red hot. The rivets in many places were loose, and water poured through the rivet holes as the vessel rolled. Nevertheless, the boarding party went on board. As the fire was so strong amidships, they could not go forward from aft on the deck; but some of them, at least, went below, and found no living persons aboard. Several members of the boarding party testified that, while on board at this time, they cut away a part of the wooden runway and a part of the wooden boom, which were on fire, to prevent the spread of the flames. This statement has been contested, but I am inclined to think that the boarding party did make some efforts along that line. It is true that Capt. Swenson did not corroborate the boarding party in this respect, but he was on board the Mariners Harbor at the time and might not have observed their efforts. However, there were no serious efforts made by the boarding party to extinguish the fire. They were in no position and had no facilities for making any serious efforts. Captain Swenson then gave instructions for the running of lines from the stern of the Mariners Harbor to the stern of the Shreveport for the purpose of swinging her around and taking her in tow. Two hawsers were finally run between the sterns of the two vessels, and the boarding party returned to the Mariners Harbor. Capt. Swenson's plan was to swing the Shreveport so as to get the wind to the leeward, in order that the flames might be blown overboard by the wind instead of over the decks. At first, he tried to swing the Shreveport against the swell. This would have been the safer operation in turning her because it lessened the danger of the fire blowing over into one of the open tank hatchways. However, he found he could not swing her against the swell and proceeded to swing her in the other direction, and finally succeeded in turning her so that the wind, instead of blowing the flames across the ship, blew them overboard and out to sea. All of this required several hours. Captain Swenson then began to tow the Shreveport, his plan being to take her into Charleston, the nearest port where repairs could be had. In consequence of the maneuver stated, of swinging the vessel around, and proceeding to tow her so that the wind would blow the flames away from the ship instead of across the deck, the fire began to diminish, and finally died down some time during the night.
When the boarding party was sent aboard, the Mariners Harbor stood about 200 feet away from the Shreveport. During this maneuver of turning, and the towing, the Mariners Harbor, according to Swenson's testimony, was kept "fairly close to the Shreveport." About midnight, one of the hawsers parted, and the Mariners Harbor slacked speed, but continued towing with one hawser. There was considerable dispute about the distance *528 that the vessel was towed, but I am satisfied that she must have been towed for a considerable distance, for the towing lasted for a number of hours; but of course the speed must necessarily have been slow. During the night, several vessels passed, but none of them offered any assistance. The Clyde liner Mohawk, a passenger ship, passed during the night, and picked up the missing boatswain, but she made no effort to give assistance, and her captain testified that, his ship being a passenger ship, he would not have undertaken the salvage of the Shreveport in the circumstances. During the morning of the 13th, the fire having completely died down, and the Mariners Harbor having the Shreveport in tow, and under control, some small tugs came out, and offered assistance; but the master of the Mariners Harbor declined, as he had a right to do, because the worst was then over, and he felt that he could salvage the ship without assistance. On the same morning, several government vessels came on the scene and were ready to assist, but their services were declined by the master of the Mariners Harbor for the same reason that he had declined the services of the tugs. He did, however, permit the government officers from one of the boats to go aboard the Shreveport for the purpose of taking charge of and preserving certain papers of the crew of the Shreveport. These papers and the charred remains of those of the Shreveport's crew who had perished in the flames were taken away by the government officers. Some time during the early part of that morning, the master of the Mariners Harbor went aboard the Shreveport; and after an inspection it was decided to put a crew aboard the Shreveport, get up steam upon her, and take her into Charleston under her own steam, convoyed by the Mariners Harbor. There has been quite a conflict between the master and some of the other officers of the Mariners Harbor as to who originated this plan. Doubtless the master very properly consulted with the chief engineer as to the possibility of getting up steam on the Shreveport, but I cannot find that the idea originated entirely with the engineer or other subordinate officers. In any event, the responsibility for the decision was upon the master, and he exercised it wisely, as the event shows. Later in the day, after the master returned to the Mariners Harbor, he sent over a crew to carry out this plan. This crew consisted of Constantino Madias, chief mate, Elie C. Carayanis, second mate, Michael P. Bonicos, chief engineer, Demetries Yatrakis, first assistant engineer, William McAteer, fireman, Charles P. Gibney, coal passer, Lon Mihos, oiler, and Vincent Finch and Frank Hagan, able seamen. For convenience, this crew will hereafter be spoken of as the navigating crew. They gathered up what material they could, in order to start the fire to warm the oil so that it would flow (the Shreveport being an oil burner), and finally succeeded in getting up steam, and, in the afternoon of the 13th, they started for Charleston. While on the way to Charleston, several small fires broke out, which the navigating crew extinguished. This fact has been denied, but several of that crew testified positively to it, and there is no contradictory testimony, and their story is not improbable. Their services while navigating the Shreveport were very arduous, but not very dangerous, as the danger had in great measure passed. Some members of the navigating crew contended that during the night, on the way to Charleston, the Mariners Harbor left them, and that they were lost, and came very near having a collision with a passing vessel. The master of the Mariners Harbor positively denied this, but he stated that he had seen the Shreveport stop and went back to find her. The charge was made in the oral argument and in the briefs, on the part of the intervening libelants, Madias and others, that the master practically abandoned the navigating crew and exposed them to great danger. I do not think this charge has been substantiated. It is extremely improbable, in the first place, that the master would have left them when there was no reason for it. It is possible that the navigating crew lost sight of the Mariners Harbor, and thought they had been abandoned; but I am satisfied that, if the Mariners Harbor lost sight at all of the Shreveport, it was for a very short time. I observed the master's demeanor very carefully when he was upon the witness stand, and especially on this point, and I am entirely satisfied with his statement. Both vessels reached Charleston about 11 o'clock a. m., September 14, and the Shreveport was delivered to her owner at 2 o'clock in the afternoon of September 15. The Mariners Harbor proceeded on her voyage and arrived safely at Brunswick. In this connection, it should be mentioned that this is the hurricane season in these waters, and that a hurricane had been reported as gathering in the West Indies and approaching the coast of the United States. It appears, however, that the master of the Mariners Harbor did not know of these storm signals at the time he first took charge of the Shreveport; but he was aware of them apparently some time during the following day. *529 At any rate, he reached Brunswick safely, before the hurricane reached that part of the coast; but the hurricane did shortly thereafter strike the very waters that he had traversed in his efforts to save the Shreveport.
The foregoing is a résumé of the main facts which are either undisputed or such as I have had no difficulty in finding. The evidence has been very voluminous, and many questions of fact have been contested very vigorously. The contest has been especially vigorous over the question of the value of the Shreveport and the necessary repairs. Upon this fact, the parties are almost as wide apart as the poles. They have differed widely also, not only upon many other facts, but also upon the amount of the award and the method of ascertaining the proper amount and of ascertaining the proportion which should be awarded to the various parties interested in the salvage services. To ascertain the facts under such circumstances and to find the amount of a proper award and to properly apportion it among all these conflicting claims is indeed a difficult task. It is impracticable to discuss all of the various questions of fact and issues between the parties without writing a volume. I shall endeavor, however, as briefly as possible, to advert to the main issues and give my reasons for my conclusions upon certain salient points.
A very vigorous attack has been made upon the claim of the captain in reference to his maneuvers and in reference to the degree of merit attaching to his performance, and this attack has been made both by the claimant and by the intervening libelants, Madias et al. Upon this point, I am entirely satisfied. I observed the captain carefully when he was upon the stand, and he impressed me as a capable seaman, a modest man, one not disposed to exaggerate his own performances. He answered all questions readily and without any effort to evade, and there is no reason why I should not accept his statements in the main. I may say that the conduct, not only of the captain, but of the whole crew of the Mariners Harbor, from the time the Shreveport was first sighted until she was delivered to her owners at Charleston, was courageous and admirable from every standpoint. These unfortunate differences have apparently arisen after the event, and are not to be taken as discrediting what they actually did. Capt. Swenson has been criticised for his maneuvers as being improper and really exposing the Shreveport to greater danger, but I do not think so. At any rate, the inescapable fact remains that he and his crew rescued the Shreveport from a position of great danger, and no other plan for her rescue has been suggested which at all satisfies my mind.
The claimant makes the charge that Capt. Swenson either did not turn the ship around at the time he claims to have done so, but waited until the fire had died down, or that the fire had already practically burned itself out by the time he started to turn her around. The claimant has no positive evidence to contradict Capt. Swenson and the other witnesses upon that point, but relies upon certain log entries of the Mariners Harbor and of the government lighthouse ship, and certain circumstances testified to by officers of certain ships that passed in the night. But upon careful consideration of the evidence, I am satisfied that the claimant's charge is not sustained. The captain's testimony and that of other witnesses is positive upon this point. It is clear that what he claims to have done is just what he ought to have done and the only thing that he could have done to extinguish the fire. The circumstances relied upon by the claimant to disprove this fact are not convincing. They may be explained, and in the case of some of them the circumstances are not sufficiently proven. At any rate, I am satisfied that the ship was turned as the captain stated and that she was on fire at the time and remained on fire for a considerable period during the time she was being towed. I am not disposed to say that witnesses who appear to be truthful, who tell a story that is not inherently improbable, but on the contrary entirely reasonable, have deliberately lied, when the circumstances to contradict them are explainable in other ways.
The further charge has been made that Capt. Swenson is contradicted by the logbook of the Mariners Harbor. The substance of this charge is that the entry in the logbook is to the effect that the ship was being towed to keep the port side to windward, when Capt. Swenson had testified that the Shreveport had been turned around so as to keep her starboard side to windward. But there is no contradiction here, when the situation of the two vessels is considered. During the towing period, the two vessels were stern to stern, so that the port side of the Mariners Harbor would be the starboard side of the Shreveport. The entry in the logbook of the Mariners Harbor was simply, "towing ship to keep port side to windward." Naturally, in entering in a logbook the direction of the wind, it would be indicated with reference to the ship in whose logbook the entry *530 is being made, and the reference to the port side means the port side of the Mariners Harbor. So far from contradicting Capt. Swenson, when this entry is properly understood, it supports his testimony.
The charge has been made also by the claimant that the crew of the Mariners Harbor were guilty of extensive plundering of the effects of the crew of the Shreveport, and also of many stores and articles belonging to the ship. If this charge be true, the salvors would forfeit their rights. As was said by the Supreme Court of the United States:
"Salvors are required by the nature of their undertaking, and by a due consideration of the large award allowed them for their services, to be vigilant in preventing, detecting, and exposing every act of plunder upon the property saved; and if they are guilty of embezzlement, whether at sea, in port, or even after the property is delivered into the custody of the law, it works a forfeiture of their claim to salvage. When secret, and purely an individual act, it is justly held not to prejudice cosalvors, who are innocent. But all may become guilty by consenting thereto, or by connivance, concealment, or encouragement afforded to the actors, or by not preventing the act when it is in their power." The Island City, 1 Black (66 U. S.) 121, 130, 17 L. Ed. 70.
This is a charge easily made, and hard to disprove, especially in the circumstances of a case like this. I am not satisfied that the charges have been made out. As to some of the property, it was practically impossible, from the nature of the articles and the number of them, for the crew of the Mariners Harbor to have taken them away without detection. As to other property, the charge is inherently improbable. There is really no competent evidence to sustain the charges, but only loose accusations of the Shreveport's crew, some of whom appear to have been intoxicated at the time the charges were originally made. The only definite evidence is that one of the officers of the navigating crew, after continuous and dirty work, without sleep, upon leaving the vessel, finding his shirt badly soiled, took a shirt belonging to one of the crew of the Shreveport, and left his own instead; and another officer, in a similar situation, took some clothing and left his own instead. The latter officer told the owner of the clothing that he had taken those articles, and the owner stated to him that it was of no consequence, to let it go,  or words to that effect. These two instances are of too trifling a nature, and cannot be considered as embezzlement or plundering, in the circumstances of the case. I find, therefore, as a fact, against the claimant, on the charges as to embezzlement and plundering.
The great contest has been, as is usual in such cases, over the sound value of the Shreveport, and the necessary repairs. Experts have testified upon both sides. I shall not attempt to enter into all the complicated details by which the sound value of the Shreveport has been fixed by the various experts; but, inasmuch as there will very likely be an appeal in this case, I deem it fair to the parties to give the main reasons for my conclusion upon this question of value, so that, if I am in error, I may be corrected by the proper tribunal. I shall endeavor to be as precise as the nature of the case will admit, but it must be borne in mind that the market value of ships is after all largely a matter of estimate and judgment, and as has been said by our own Circuit Court of Appeals:
"In a salvage case, however, the property is valued, not for the purpose of paying its salvor for its partial or total destruction or appropriation, for he never owned any of it, but solely because what it is worth is one of several factors to be considered in fixing his reward. * * * In this as in other salvage cases, it is unnecessary to reach anything more precise than a rough approximation of the worth of the salved property in the condition in which it was upon the completion of the salvage service. We shall therefore not attempt any further analysis of the evidence as to value." Rand v. Lockwood (C. C. A. 4th) 16 F.(2d) 757, 759.
The opinions of the experts in this case are in hopeless conflict. There is an old saying that, when doctors differ, laymen may do as they please. The latitude allowed by this saying would be far too great for a court to adopt it in deciding upon conflicting expert testimony, but it has a modicum of wisdom in it. In cases of such conflict, the lay mind, being without technical knowledge upon the subject, naturally adopts the opinions of those experts which are more in accordance with the layman's own observations and experience. In such cases also, the court looks about for outstanding facts from which the lay mind can safely draw inferences and is aided by its judgment of the care and accuracy with which the contrasted experts respectively have determined the data upon which they base their conclusions. Compare the observations of the Supreme Court upon this subject in North Dakota v. Minnesota, *531 263 U. S. 365, 386, 387, 44 S. Ct. 138, 68 L. Ed. 342.
The experts for the claimant placed the market value of the ship, excluding certain stores, etc., at $40 per dead weight ton, making a total (using round numbers) of $400,000. The experts for the salvors placed the market value at $50 per dead weight ton, making a total (using round numbers) of $500,000. Upon very careful study of all the evidence and the reasons advanced by the experts, I have come to the conclusion that the experts for the salvors are nearer the mark than those for the claimant. The conclusions of the experts for the claimant are subject to criticism in a number of particulars, and I shall advert as briefly as possible to the most important. In the first place, I think that they laid too much stress upon their comparison of the sales of vessels which occurred nearer in point of time to the date of the fire, but which in the circumstances were not so valuable for purposes of comparison as vessels of a greater similarity to the Shreveport which were sold at a later period. I have reference particularly to the fact that in my opinion they did not give sufficient importance to the sale of the Dilworth, which was a sister ship of the Shreveport, and of course more comparable than any other of the vessels whose sales were used as a basis of comparison. It is true that, when the Dilworth was sold, prices had advanced; but it was shown that, even at that time, there was a marked difference in the price of the Dilworth as compared with other vessels sold when the Dilworth was sold which were more comparable to the vessels which had been sold at an earlier period. Upon these earlier sales, claimant's experts laid great stress  too great, in my opinion. It must be borne in mind that, in property of this nature, it is not possible to establish an absolute market value on a particular date by sales; because there may be, and in fact in this case were, no sales on that particular date. The nearer sales of comparable vessels are of course more valuable than later sales when the market may have gone down or up. Nevertheless, some latitude must be allowed, and, as stated, I cannot but be impressed with the fact that the Dilworth, a sister ship, afforded a better basis of comparison, making due allowance for the advance in prices, than the sales of those ships upon which the experts for the claimant mainly rely. I am inclined to think that the experts for the salvors laid too much stress on the sale of the Dilworth and other vessels sold when she was sold, but I do not think their conclusions are subject to attack in such marked degree as the conclusions of the experts for the claimant.
There is another very serious criticism to be made of the conclusions on the part of the claimant and its experts. They placed the market value at around $400,000, making certain small additions for stores, etc., claiming necessary repairs around $360,000, and thus claiming the salved value of the Shreveport at around $45,000 to $46,000. But it was admitted by one of their experts, and was testified to by at least one other expert, that the junk value of the Shreveport was considerably in excess of $75,000. There must be something radically wrong with their opinions when such a result is reached. The claimant in this case, it would appear, spent around $360,000 to save some $46,000, when it could have junked the ship for $75,000, and probably a great deal more. It is asking too much of even the most credulous to believe that sensible men would have adopted such a course.
Another serious point of criticism is in reference to the equipment which was on the Shreveport, known as the Sperry gyro compass, and automatic steering device. The Shreveport at the time of the accident was equipped with this Sperry gyro compass, etc. The cost of such an equipment is over $10,000. When she was repaired, this gyro compass was replaced, and, in the bill for repairs, the expense of replacing it is placed at $10,910. Some of the experts for the claimant did not know whether they had included the value of this gyro compass in their estimate of the Shreveport or not. Some of them did not know whether the ships whose sales were used as a basis of comparison were equipped with a gyro compass or not. As I recall it, at least one of them testified that it would not add substantially to the value of the ship. I think that an expert who fails to take into account an equipment which costs such a large sum exposes the value of his estimate to serious discount. One thing is certain: The claimant cannot blow hot and cold; and if I am to allow $10,910 as a part of the repairs of the Shreveport for the gyro compass, then, by the same token, the gyro compass must be taken into consideration in estimating the sound value of the Shreveport, for she was concededly so equipped at the time of the fire.
There is another matter of some significance in connection with the claimant's valuation. For the main repairs the claimant had two bids: Shewan's bid for $284,000, and Robins' bid for $272,400. The claimant *532 accepted Shewan's bid. There is no claim made that Robins could not do the work as well as Shewan. The claimant's explanation of the acceptance of Shewan's bid is that under Shewan's bid the repairs would be made in thirty days less time than under Robins' bid; and that, during that period, the Shreveport would earn gross about $24,000, much more than the difference in the two bids. Claimant's counsel, in their brief, make this point, and also state that, in addition, it would have been necessary to keep certain "key" men during the extra period of thirty days, and that the interest alone on the value of the ship, $400,000, for one month, would amount to $2,000. But the argument proves too much. If the Shreveport could earn $24,000 a month, she surely must have been worth more than $400,000. At least it is a significant circumstance as tending to show that the claimant's estimate of the value is too low.
There is another point which impresses me as of some merit and indicating that the claimant and its experts placed too low a valuation upon the vessel. There can be little doubt but that, after the repairs were made, the Shreveport was in superb condition and a source of pride to the owner. Her name was changed and she became, as was conceded, one of the best, if not the best, of the boats in their service. In the bill for repairs is an item of $26,639 for certain extra riveting. This amount, it appears, was disallowed by the insurance companies who carried the policies upon the Shreveport, on the ground that the rivets had become corroded or otherwise loosened from other causes than the explosion and fire. I cannot but be impressed with the thought that this extra riveting put the Shreveport in better condition and gave her a greater value than that placed upon her by the claimant and its experts. If this be true, then either some addition should be made to the valuation of those experts or else some diminution should be made in the allowance of this particular item of the repairs. The evidence upon this point is not made as clear as it should have been, and it is difficult to say just what should be allowed in this respect; but I am convinced that there should be some allowance made on that score. It is obvious, I think, that, if certain repairs are to be allowed in full, the sound value placed upon the Shreveport before the fire must be based upon a valuation as if she were in first-class condition, the same as she stands after the repairs. If this were not so, the effect would be to make the salvors pay pro tanto from the award for repairs in need of which the Shreveport stood before the fire. In other words, I am impressed with the view that the claimant and its experts, if called upon to value the Shreveport, in her repaired condition, would or ought to make a higher valuation than they placed upon her before the fire. I do not mean of course that the whole of this item of repairs should either be disallowed or added to the sound value; but I think it is a matter for consideration and strengthens my view that the valuation of the claimant and its experts is too low. The repair bill also contains an item for supplies of $10,492.44, and the same consideration applies in some measure, though not nearly to the same extent, as to the item for riveting. There was testimony also that the Shreveport had a very superior machine shop equipment and was especially well equipped with spare parts, tools, stores, etc. The salvors called upon the claimant to produce its lists of these stores, equipment, etc., showing their values, but this was never done. The claimant concedes stores only to the value of $2,000. One of the witnesses estimated the machine shop equipment alone at $30,000, and another witness placed the stores and engine room equipment at the value of $7,500. The brief for the owner and charterer of the Mariners Harbor asks the court to assume that all these parts exceeded $40,000. I deem this too high. It is unfortunate that the claimant did not see fit to produce the lists of these parts and especially their values, which would have been more satisfactory; but while I cannot assume the high valuations claimed by the salvors in this respect, nevertheless I must make some allowance for these items in arriving at the sound value of the whole salved property.
The salvors called upon the claimant repeatedly to produce the insurance policies and also the notes for the purchase price of the Shreveport as evidence in ascertaining value. At the taking of one of the depositions, the claimant's attorney stated that the policies would be produced, but they were never produced. The claimant's position is that these matters have no relevancy in ascertaining value. I think that it would have been better if the claimant had produced these papers, in order that the question might be presented and let the court rule whether they had any relevancy or not; and, if relevant, what weight should be attached to them. While I am not prepared to rule definitely until the question is presented, whether the amount of insurance is a relevant matter, nevertheless it is to be noted that the Supreme Court of the United States, in the case *533 of The Elfrida, involving salvage services, said: "The value of the ship is variously estimated at from $70,000 to $110,000, but the sum for which she was insured, £18,000, or $90,000, may be taken as her approximate value." The Elfrida, 172 U. S. 186, 205, 19 S. Ct. 146, 153, 43 L. Ed. 413. So likewise the price of an article may in many cases be indicative of its value. However, I have reached a satisfactory conclusion as to the sound value without the aid of any inferences to be drawn from the nonproduction of these papers.
The salvors have criticised in a number of other respects, the methods and conclusions of the claimant's experts relative to the sound value, and many of them I think are well taken; but it would unduly amplify this opinion to discuss them in detail. In this connection, I may say that in using the word "criticism," or in making comments in the course of this opinion, it is not intended to impugn the good faith of any of the parties, or any of their attorneys or witnesses. But these are all matters of estimate and opinion, and the criticisms and comments are made simply to show that the positions of the parties are not well taken, and no more. There is some criticism to be made of the testimony of the experts for the salvors, and for that reason I have not accepted their figures absolutely; but, as stated at the outset, I think they are far nearer the mark than the experts for the claimant. Upon the question of sound value, my conclusion is that (including in this estimate the value of the Sperry gyro compass and steering device), not taking into consideration certain other items which I will mention later, the sound value of the Shreveport at the time of the fire was at least $47 per dead weight ton. Her dead weight tonnage being 10,050, would make the sound value $472,350. The other items which I think should be added, I shall not attempt to be precise about or give details as to how my conclusion has been reached. Taking into consideration the fact that the claimant received a better boat after she was repaired than the boat as valued by the experts, taking into consideration the superior machine shop equipment, tools, spare parts, supplies, stores, and all other items (except the oil), I think $10,000 should be added. It was conceded that there were 3,900 barrels of fuel oil of the value of $1 per barrel, and there should be therefore added the further sum of $3,900. This makes the total sound value of all property salved, $486,250.
I come now to a consideration of the claimant's bill for repairs. In ascertaining the salved value, the repairs made are not necessarily in all circumstances an absolute or even a fair guide for the deductions to be made from the sound value. But ordinarily the costs of the repairs actually made in good faith and which are not exorbitant or extravagant are a fairly safe guide and should usually be allowed as deductions from sound value. The salvors have objected to the allowance of a number of these items, but I shall discuss only the more important.
The main bill for repairs was Shewan's bill of $284,000. However, Robins, a reputable shipbuilding concern, made a bid for $272,400. The only reason apparently for the acceptance of Shewan's bid was that the ship would be delivered thirty days earlier than under Robins'. I do not think the claimant should be allowed to accept the highest bid simply because it was in haste to have the vessel for reasons of its own, and throw this extra expense pro tanto upon the salvors. I shall therefore disallow the difference between these two bids, namely, $11,600.
In the bill appears an item for survey services of the Salvage Association of London; but in the bill appears also the regular survey fees, and it appears that these London survey fees were required by the insurance companies and were unnecessary, so far as the repairs are concerned. In other words, this amounts to a duplication of survey charges. I shall therefore disallow the London Salvage Association's fees, amounting to $4,500.
The salvors do not directly attack the charge for replacing the Sperry gyro compass, which amounts to $10,910, but they claim that it should be either eliminated or taken into consideration in ascertaining the sound value. I have taken it into consideration in ascertaining the sound value, and this item will therefore be allowed in full as a repair charge.
The salvors claim also that the sum of $26,639.23 for what is denominated extra riveting should be excluded entirely. It appears that the insurance companies refused to pay this item and excluded it on the ground that the necessity for extra riveting was not caused by the explosions or the fire, but was due to previous corrosion or loosening of the bolts from other causes. I do not think that this item should be excluded on that ground, but, as I have heretofore stated, these and other similar repairs which were necessary before the fire should not be included as a deduction from sound value, unless the sound value was ascertained as if the vessel were in first-class *534 condition, that is to say, in as good condition as she would be when the necessary repairs are made. I have previously taken into consideration this matter in ascertaining sound value, and for that reason this item for repairs will be allowed in full.
As to the item of $10,492.44 for supplies, this would seem to be a very heavy bill, and it does not seem probable that such large supplies were lost in the fire in view of all the circumstances. The same consideration, to some extent, applies here as in the case of the extra riveting, but not to the same degree. I shall therefore allow this item in full as a proper subject for deduction, having given the matter due consideration in ascertaining the sound value of all property.
The remaining items of the repair bill will be allowed in full. The total amount of repairs claimed is $359,624.26. I have disallowed on account of difference in bids, $11,600, and London Salvage Association survey fees of $4,500, making the total sum disallowed, $16,100. Deducting this sum leaves a balance for repairs allowed of $343,524.26.
The sound value of all property I have fixed at $486,250. Deducting therefrom repairs amounting to $343,524.26 leaves a balance of $142,725.74, which I find to be the salved value of all property.

 Recapitulation.
 10,050 D.W.T., @ $47 per ton .................. $472,350 00
 Add to cover all other items (except oil) ..... 10,000 00
 3,900 bbls. fuel oil .......................... 3,900 00
 ___________
 Total sound value of all property ............. $486,250 00
 Deductions for Repairs.
 Total claimed .................... $359,624 26
 Disallowed.
 Difference in bids..... $11,600 00
 London Survey fees .... 4,500 00 16,100 00
 __________ ___________
 Balance repairs allowed .......... $343,524 26
 Deduct .................................... 343,524 26
 ___________
 Total salved value ........................ $142,725 74

As to the value of the Mariners Harbor, there has been practically no contest. After the salvage services were rendered, she was taken to Europe and sold there for $52,500, and underwent repairs to the extent of $15,000. For the purposes of this case, it is not necessary to be exact as to her value. It was practically conceded that she was worth at the time of the fire between $50,000 and $60,000, and I so find.
It is unnecessary to enter into any discussion of the principles upon which the admiralty law awards salvage in contrast to the principles of the common law. See Mason v. The Blaireau, 2 Cranch, 240, 2 L. Ed. 266. It is sufficient to say that the case does not depend upon contract nor upon any principle of quantum meruit, and the award should be allowed in accordance with the principles of salvage under admiralty law. The basic principle is that such an award should be made as will encourage others in similar circumstances to save property exposed to the perils peculiarly incident to the sea. But at the same time the award should be fair to the owners and not be made so large as to impose an undue hardship upon them.
While the amount of a salvage award is largely a matter of judicial discretion, in the circumstances of the particular case, still there are certain general principles which are well recognized. They have been stated by the Supreme Court of the United States as follows:
"Courts of admiralty usually consider the following circumstances as the main ingredients in determining the amount of the reward to be decreed for a salvage service:
"(1.) The labor expended by the salvors in rendering the salvage service.
"(2.) The promptitude, skill, and energy displayed in rendering the service and saving the property.
"(3.) The value of the property employed by the salvors in rendering the service, and the danger to which such property was exposed.
"(4.) The risk incurred by the salvors in securing the property from the impending peril.
"(5.) The value of the property saved.
"(6.) The degree of danger from which the property was rescued." The Blackwall, 10 Wall. 1, 13, 19 L. Ed. 870.
In this case, there is involved also the question of whether or not the vessel saved was a derelict, and whether or not the moiety rule should be applied.
It is also proper to consider the degree of success achieved and the proportions of value lost and saved. See The Sandringham (D. C.) 10 F. 556, 573.
In reference to the amount of award to be made, the parties have cited numerous cases, and, while I had read nearly all of them before, nevertheless I have read them again to refresh my memory. They have been useful as indicating the opinion of learned and experienced judges in similar matters and assisting the court in refraining from going to too great an extreme either of generosity or of parsimony. But while the various *535 awards made in those cases are helpful, it must be remembered that no two cases are exactly alike, and that every case must stand upon its own facts and circumstances.
In the present case, while the services rendered did not cover any great period of time, nevertheless they covered several days. There was considerable labor expended, and this especially applies to the arduous labors of the navigating crew. They toiled constantly at hard and dirty work, without sleep, navigating with nine men a very large vessel that needed a much larger crew. There can be little doubt, too, that the services were rendered with promptitude, skill, and energy. There was no hesitation on the part of the Mariners Harbor in going to the assistance of the Shreveport. I think the captain displayed judgment and skill in rescuing this vessel from what might have been deemed an almost hopeless situation. The crew were all willing to volunteer for dangerous service and co-operated with him from beginning to end, cheerfully and efficiently.
The value of the Mariners Harbor was not large as compared with the sound value of the Shreveport. Nevertheless, the Mariners Harbor was worth between $50,000 and $60,000. While the danger to her was not extreme, she was in some danger when she stood by the Shreveport and made fast the hawsers, and to some extent during the period of towage. Being so much smaller than the Shreveport, if, after the hawsers had been made fast, an explosion had occurred upon the Shreveport and burst her asunder, she might have dragged the Mariners Harbor down with her. It was testified, however, that during a portion at least of the towage a man was stationed at the stern of the Mariners Harbor with instructions in such event to cut the cable immediately. There was some personal risk incurred by the whole crew of the Mariners Harbor, but it was not very great. A very severe explosion might have so involved the Mariners Harbor as to have created some risk to her crew, during the first part of the operations I have referred to. But the crew as a whole stood in no great danger. There was extreme danger, however, to the boarding party. In addition to this, they knew nothing of the situation of the vessel below and the apprehension must have been greater than the actual facts as afterwards ascertained warranted. The terror of the unknown subdues at times even the most courageous hearts. The navigating crew also were in some danger, for there was testimony that several small fires broke out while they were aboard. But I do not think that they were in any great danger. As this was the hurricane season and a storm was then approaching from the West Indies, there was some danger to both vessels and their crews. If the storm had struck before they arrived at Charleston, there was a possibility that both vessels would be lost. Fortunately, the storm did not break until shortly after the Mariners Harbor had arrived safely at Brunswick. So I am not disposed to lay any great stress upon that point, but it is worthy of consideration. I have already stated the value of the whole property saved. The value lost is far greater than the value saved. Too large an award would therefore bear heavily upon the claimant, who has already suffered heavily. On the other hand, I must take into consideration the highly meritorious services rendered by the salvors, and not allow the fact of the heavy loss incurred to diminish the award to such an extent as would make it unfair to them, or tend to discourage others instead of encouraging them to perform similar services.
The degree of danger from which the vessel was rescued was certainly very great. Her crew had left her. There had been three explosions, which might be followed at any time by others. She was on fire, rolling helplessly in the sea, near one of the most dangerous portions of the coast, with the wind and swell such that she might be carried at any time on Frying Pan Shoals, where she would undoubtedly be lost in any event. The claimant contends that the wind and tide would not have carried her on to Frying Pan Shoals. I think the probabilities are otherwise. However, even if the wind and the swell were not in the proper direction at that time for such a result, nevertheless it might have changed at any time. The claimant contends that the Shreveport would have been saved by the government boats or the tugs. But these vessels did not arrive until some time the next morning, and the great probabilities are that by that time it would have been too late. The claimant also insists that the vessel lay in the lane of coastwise commerce, and there was hope that she would be rescued by passing steamers; but the fact remains that, of the several steamers that passed, none offered any assistance. The coastwise steamers, especially passenger vessels, are reluctant to endanger their vessels and the lives of their crews and passengers in such cases, as evidenced by the positive statement of the commander of the Mohawk, that he would not have undertaken the salvage of the Shreveport in the circumstances. I am constrained to think that, unless the *536 Mariners Harbor or the Dutchman undertook the salvage, the great probabilities are that the Shreveport would have been lost before any other vessel could have reached her and undertaken her rescue.
The salvors insist that the Shreveport was a derelict, and that the moiety rule should be applied, giving them one-half of the salved value. The claimant insists that the Shreveport's situation did not bring her within the legal definition of a derelict, and that the moiety rule no longer obtains, or at least is certainly not a fixed rule of law. It is claimed that the crew of the Shreveport expected to return and endeavor to salvage her, or that in any event they had hope of her being saved by the government vessels or tugs sent out from Wilmington. I do not think that the crew of the Shreveport had any intention of returning themselves. Every fact and circumstance in the case points to the conclusion that, as far as they were concerned, they had given up hope of doing anything for the vessel. The captain's idea apparently was to leave the whole situation to the owner, and that was the object of his radiogram. The captain and the crew may have entertained some hope that the Shreveport might be rescued later, but it was a very faint one. Captains who abandon vessels nearly always have some hope of the vessel being ultimately recovered. If the Shreveport was not technically a derelict, nevertheless her situation and extreme peril were such as to bring her very nearly within the meaning of the term. However, I do not think it necessary to decide whether the Shreveport was technically a derelict or not. I do not think the moiety rule is a fixed rule of law, even in the case of technical derelicts. While the rule may in many cases be properly adopted, nevertheless the reward should be governed by the same principles as other salvage cases. Post v. Jones, 19 How. 150, 161, 15 L. Ed. 618. The court may and should award either more or less than a moiety upon due consideration of all relevant facts, under the principles governing salvage cases.
Upon due consideration of all the facts and circumstances of the case, and the principles governing salvage cases, I conclude that the award should be fixed at one-third of the salved value of all property. In this one-third, I however include salvage expenses which are payable to the charterer and owner. It appears to be more logical to consider these as direct expenses, deductible first from the salved value, and the award based upon the balance. But, in this particular case, the proportion of the salvage expenses to the salved value is not large, and I consider one-third of the salved value to be sufficient to cover both the expenses and a fair amount to all the parties entitled to share in the salvage. Expenses may be included in the award or added to the award, as the court sees fit. The Kanawha (C. C. A. 2d) 254 F. 762, 765. The award will therefore be fixed as stated at one-third of the salved value, but the expenses shall be first deducted from the award and the balance then distributed among the parties as hereinafter provided.
The charter party of the Mariners Harbor provides that salvage shall be for owners' and charterers' equal benefit, after deducting owners' and charterers' expenses and crew's proportion. I find the charterers' expenses amount to $1,273.35, and the expenses of the owner of the Mariners Harbor amount to $734.71, making total expenses of $2,008.06. These amounts therefore will be deducted from the award, and the balance distributed among the various parties entitled to share in the award.
Before considering what is a proper distribution of the award, the question should first be considered of the rights of the Aldecoa. This involves a decision of the question heretofore left open, whether the Aldecoa should be allowed in any event to intervene; and, if she be so allowed, whether the facts disclose a case entitling her and her crew to share in the award. The objection to the intervention is made on the ground that, bond having been given and the vessel released, a new lienor cannot intervene and deprive the original libelants of any of their rights under the bond, and that such claims are not within the terms of the bond.
There can be no doubt that, when a vessel has been released on bond, an intervention which sets up a new cause of action cannot be allowed. The introduction of a new cause of action is something which the sureties are not bound to contemplate, and consequently they cannot be held liable. The Oregon, 158 U. S. 186, 15 S. Ct. 804, 39 L. Ed. 943; The Beaconsfield, 158 U. S. 303, 15 S. Ct. 860, 39 L. Ed. 993; The T. W. Snook (D. C.) 51 F. 244; The Livingstone (D. C.) 104 F. 918; Mason v. Marine Insurance Co. (C. C. A.) 110 F. 452, 54 L. R. A. 700.
But these same cases recognize that, where a claim is simply for a part of the fund, it is not a new cause of action and the intervention should be permitted. The condition *537 of the bond in the present case is that the stipulators "shall abide by all orders of the court, interlocutory or final, and pay the amount awarded by the final decree rendered," etc. Stipulations in admiralty are not subject to the rigid rules of the common law, but are regarded as a substitute for the property released, and are to be interpreted as to the extent and limitation of responsibility created by them by the intention of the court which required them and not by the intentions of the parties who are bound by them. The Beaconsfield, supra. The stipulation is to pay the amount awarded by the final decree, and the parties must be deemed to have contemplated that they should pay the amount that should be awarded by the court to all persons who may be entitled to share in the award, whether such claim be presented by the original libel or by intervention. The only question then is whether or not the claim of the Aldecoa is simply to a share of the salvage award or whether her claim constitutes a new cause of action. Upon this question, in view of the history of the statute creating the right and the terms of the statute itself, I have no doubt.
Formerly, independent life salvors had no cause of action. By an International Convention, to which the United States was a party, provision was made for salvors of human life to obtain a fair share of the remuneration awarded to the salvors of the property. See article 9 of this Convention, 37 Stat. 1672. In order to carry out this purpose, Congress passed the Act of August 1, 1912, c. 268, 37 Stat. 242 (sections 2, 3 [U. S. Code, title 46, §§ 728, 729, 46 USCA §§ 728, 729]). The second section of that act requires the master of every vessel, so far as he can do so without serious danger to his own vessel, crew, or passengers, to render assistance to every person who is found at sea in danger of being lost.
The third section provides as follows: "Salvors of human life, who have taken part in the services rendered on the occasion of the accident giving rise to salvage, are entitled to a fair share of the remuneration awarded to the salvors of the vessel, her cargo, and accessories."
It is clear that the claim of the Aldecoa is not a new cause of action, but is simply a claim for a fair share of the award which is to be made to the property salvors. It is suggested that the effect of this is to reduce the claim of the property salvors, and that therefore the intervention should not be allowed after the vessel has been released upon bond. Even if it should be conceded that the effect is to reduce the share of the property salvors, nevertheless the intervention should be allowed. The original libelants are presumed to know that all who may be entitled to a share of this award might come in and intervene to protect their own interests. They and the sureties on the bond are presumed to know that when the court proceeds to make the award, it will take into consideration every party's interest in that award and make such award as a consideration of all relevant facts demands. Life salvors are as much entitled to come in and participate in the award as any member of the crew of the original libelant or any other person having an interest in the award, whether the effect of such intervention be to add to or diminish the amount to be awarded from a consideration of all relevant facts as finally presented. The order therefore heretofore made allowing the Aldecoa and her crew to intervene was proper, and will not be disturbed.
It is insisted however by the original libelants, and to some extent by some of the other parties to the cause, that the facts of the case do not entitle the Aldecoa to a share of the award. It is said, in substance, that the Aldecoa was not a participant in the salvage services, but that her services were so disconnected in point of time and otherwise with the services of the property salvors that her services cannot be deemed to be within the meaning of the statute. But to deny the Aldecoa remuneration would be to defeat in many instances the purpose of the statute. The purpose of the statute was to place human life at least on a parity with property, and not leave weak human nature, when confronted with the choice of saving life or property, under the selfish stimulus of a desire to save property instead of life. Here the Aldecoa was confronted with the necessity of deciding at once between life and property. Her master chose the humane and proper course of saving life and disregarding whatever opportunity may have existed to save property. It is urged that the Aldecoa would probably not have undertaken the salvage of the property in any event. Of this I am not so sure. But be that as it may, by saving human life, the Aldecoa gave up an opportunity to save property. As to the point that the services of the Aldecoa are so disconnected in point of time and otherwise as to deprive her of a right to share in the award, there may be cases where the act of *538 saving life and the act of saving property are so disconnected and wide apart in point of time and otherwise, that the life salvors should not participate. But I do not think that is the case here. The statute says that the salvors of human life who have taken part in the services rendered "on the occasion of the accident giving rise to salvage are entitled, etc." The occasion here was the explosion on the Shreveport, the consequent fire, and the continuance of the fire and peril of the vessel until she was rescued and placed in safety by the Mariners Harbor. The Aldecoa certainly rendered services during this occasion. The statute should be liberally construed with the humane object in view. It does not mean that only those who took part in rescuing the property are entitled to share in the award. Life salvors, even though acting independently of the property salvors, are entitled to share in the award, provided their services are rendered on the occasion of the accident giving rise to salvage.
It is urged, however, by the original libelants and some of the intervening libelants that the Aldecoa should be debarred from participating in the award on the ground that there was an agreement between the master of the Aldecoa and the master of the Shreveport for the payment of the expenses of the Aldecoa. It is to be observed that the claimant, the owner of the Shreveport, who is the party who would be bound by such an agreement, has not made this point; but it is presented by others who are not parties to the agreement. It appears that, after the rescued crew had been brought to Southport, the captain of the Shreveport gave to the captain of the Aldecoa a letter, which was incorporated in the log of the Aldecoa, and is as follows:
"I, the undersigned, Master of the S/S `Shreveport' from New York hereby declare that I have asked assistance from the Spanish steamer `Aldecoa' having to abandon our ship the `Shreveport' 2 miles to the-S. W. from the lighthouse Frying Pan Shoal due to explosion in the tanks and fire, and proceed to the port of Wilmington to deliver us, and I therefore assume responsibility for all expenses that may arise therefrom to the S/S `Aldecoa' in accordance with the laws of the Lloyd's."
There is grave doubt whether this letter constitutes a binding contract. It certainly was not an executory contract, for the service had already been performed. Compare The St. Charles (C. C. A. 4th) 280 F. 334, 336. If it was a contract at all, it was in the nature of a mere agreement for reimbursement of expenses, and certainly could not be deemed to have contemplated either an accord and satisfaction of salvage services or a release of the Aldecoa's right to share in the award. There is no proof that the master of the Aldecoa accepted the offer. The letter appears to have been entered in the logbook; but that would not necessarily mean that the master had accepted it, but might merely be an entry of the fact; the logbook being kept for the entry of daily occurrences on board ship.
But assuming, without deciding, that there was a binding agreement, I do not think that any one but the contracting party has a right to set up that agreement. The owner of the Shreveport makes no claim under it, and has a perfect right to waive its rights under the agreement, if it sees fit. The agreement was not made for the benefit of the other parties to this cause, and they have no rights under it, and no right to complain.
But there is another conclusive reason why this contention cannot prevail. Not only must there be a binding contract, but it must be pleaded, and there must be tender or payment. The Excelsior, 123 U. S. 40, 49, 8 S. Ct. 33, 31 L. Ed. 75; The Camanche, 8 Wall. 448, 477, 19 L. Ed. 397.
Here the contract is not set up by any pleading and there is no plea or claim that there has been any tender or payment.
The attorney for the Aldecoa insists that the agreement in any event should be set aside. It must be confessed that the enforcement of the agreement in the circumstances would be highly inequitable. While there are decisions that the courts may exercise a wide discretion in setting aside such agreements, yet the Supreme Court of the United States has stated that they were unable to assent to the general proposition that salvage contracts are within the discretion of the court and may be set aside, where, after the service is performed, the stipulated compensation appears to be unreasonable. The Elfrida, 172 U. S. 186, 196, 19 S. Ct. 146, 43 L. Ed. 413. Article 7 of the International Convention referred to (37 Stat. 1671) provides, however, in the first paragraph that every agreement as to salvage entered into at the moment and under the influence of danger may be annulled or modified by the court if it considers it inequitable. The second paragraph provides that in all cases when the remuneration is, in proportion to the services rendered, in an excessive degree *539 too large or too small, the agreement may be annulled or modified by the court. It would appear that, under these provisions, the Supreme Court would probably modify the views expressed in The Elfrida Case, but I do not consider it necessary to decide whether the contract should be set aside under the decisions referred to by the attorney for the Aldecoa, or under the provisions of the International Convention. These and other points raised by the Aldecoa in reference to the contract may be well taken, but I prefer to rest my decision on the grounds I have mentioned.
I hold therefore that the Aldecoa is entitled to share in the award. But as to the amount of that share, I do not think it should be so large as her attorneys have suggested. Neither the Aldecoa nor her crew were in any danger whatever. The Aldecoa was not very much delayed on her voyage; and, while it appears that she was in some haste to meet an engagement at Boca Grande, yet it has not been shown that she did not reach there in time for her engagement, or suffered any damages from the delay. Her crew performed no services beyond their ordinary duties. All that the Aldecoa gave up was the right to undertake the salvage of the property. I think the sum of $5,000 would amply reward the Aldecoa and her crew, and at the same time be sufficient to stimulate others in like position to take similar action. Of this sum, I do not think her crew are entitled to as much as is usually accorded crews in salvage services, for they did nothing out of the ordinary. I think four-fifths for the Aldecoa, and one-fifth to her crew, is a proper distribution.
This brings me to a consideration of what is a fair distribution among the owner, charterer, and crew of the Mariners Harbor. Under the rule once prevailing in admiralty, the owners of the salving vessel could not receive more than one-third of the award, unless there were unusual circumstances of peril to the salving vessel. This was upon the theory that the services of the crew were the main factors in the salvage. But with the advent of steam vessels, it was thought that the services of the vessel became a more important factor and a larger proportion has been usually allowed the vessel. In some cases, the vessel has been allowed as much as four-fifths, in others two-thirds, and in other cases three-fifths. There is no fixed rule with regard to the proportion to be allotted. As salvage is awarded for the encouragement of promptness, energy, efficiency, and heroic endeavor in saving life and property in peril, the claims of the master and crew who exhibit these qualities must meet the most favorable consideration. But at the same time an allowance must be made for the owner whose property has been imperiled. See Cape Fear Towing & Transportation Co. v. Pearsall (C. C. A. 4th) 90 F. 435, 438, where the subject is fully discussed. See, also, The Santa Rosa (C. C. A. 4th) 5 F.(2d) 478; Id. (D. C.) 295 F. 350, and the Pomona (D. C.) 37 F. 815, 816.
The cases also recognize that special awards should be made to those members of the crew who exhibited special skill or were exposed to special dangers. The Santa Rosa, supra. The F. Q. Barstow (D. C.) 257 F. 793, 797.
The master of the Mariners Harbor, J. F. Swenson, exhibited skill, promptness, and energy, and is entitled to a special award. I think the sum of $1,500 should be awarded him, the same to be in addition to his share as a participating member of the crew in the allowance hereinafter made to the whole crew.
A special award should be made to the boarding party for their courageous services in boarding and exploring the vessel, under the circumstances stated. As these services involved danger to life, I think the special award made to the boarding party should not be in proportion to their wages, but each man should receive the same amount. I think also that the amount awarded to the boarding party should be in addition to any sums they may receive under the special award allowed any of them as members of the navigating crew, and also in addition to their shares as participating members of the crew in the allowance hereinafter made to the whole crew. The sum to be allowed each member of the boarding party, to wit, Constantino Madias, Elie C. Carayanis, Michael P. Bonicos, Vincent Finch, and Frank Hagan, is hereby fixed at $700 each; making a total for the boarding party of $3,500.
A special award is also made to the navigating crew for their arduous labors and the danger also to which they were exposed, and the amount allowed to each one of them will be in addition to any special awards hereinabove made to any of them, and will also be in addition to their respective shares as participating members of the crew in the share hereinafter awarded to the crew as a whole. I fix this amount to the navigating crew, to-wit, Constantino Madias, Elie C. Carayanis, Michael P. Bonicos, Demetries Yatrakis, William *540 McAteer, Charles P. Gibney, Lon Mihos, Vincent Finch, and Frank Hagan, at $250 each, making a total of $2,250 to the navigating crew.
After deducting from the award the expenses of the owner and charterer, the share allotted to the Aldecoa, and the special awards hereinabove made to the captain, the boarding party and the navigating crew, I direct that the remainder shall be divided as follows, to wit: Three-fifths to the owner and charterer of the Mariners Harbor, and the remaining two-fifths to the whole crew of the Mariners Harbor (including the boarding party and the navigating crew), the amount allotted to the crew to be divided among the crew in proportion to their monthly wages. The three-fifths allotted to the owner and charterer of the Mariners Harbor will be divided between them equally as provided by the charter party.
In making this division, I have taken into account the various considerations which should govern the apportionment. But I deem it proper to make a few other observations. The share to the owner and charterer I would have made larger, except for the fact that the vessel itself was in small danger compared to the danger to the boarding party and in some measure to the danger to which the navigating crew were exposed. In fixing the amount of the special awards, I took into consideration also the fact that the whole crew volunteered for any services of danger or labor, and that, while the navigating crew had arduous labor, nevertheless the remainder of the crew had their labors increased because they were forced to navigate the Mariners Harbor short-handed. I think there is a difference between the situation of the Shreveport and the case of a fire or other peril incurred in or near a harbor where assistance may be more readily obtained. The case, too, of the Mariners Harbor is different in some respects from that of tugs, a part of whose business it is to render salvage services and which are specially equipped for that purpose. Nor is the situation of the crew of the Mariners Harbor like that of the crews of such tugs, for the latter are engaged for the special purpose, among others, of salvage services, and their contract necessarily contemplates that they may be exposed to great hardship and danger. For these reasons, I think the Mariners Harbor and her crew are entitled to a somewhat larger sum than would be awarded to professional salvors in the same circumstances. But it is inadvisable to pursue the subject into further details. I believe the foregoing is clear enough for the preparation of the decree, but, in order that there may be no misunderstanding, I append the following:

 Recapitulation.
 Distribution of Award.
 One-third of salved value ................ $47,575.24
 Charterer's expenses .... $1,273.35
 Owner's " .... 734.71 2,008.06
 _________ __________
 Balance ............................... $45,567.18
 To Aldecoa (vessel 4/5, crew 1/5) ........ 5,000.00
 __________
 Balance ............................... $40,567.18
 Special awards to crew, Mariners Harbor.
 Master .................. $1,500.00
 Boarding party (5) ...... 3,500.00
 Navigating crew (9) ..... 2,250.00
 _________
 Deduct total .......................... 7,250.00
 __________
 Balance ............................... $33,317.18
 Division of Balance
 To whole crew Mariners Harbor, 2/5 ....... $13,326.88
 " owner and charterer, 3/5 .............. 19,990.30
 __________
 Total ................................. $33,317.18
 Division between Charterer and Owner
 One-half to charterer .................... $9,995.15
 " " " owner ........................ 9,995.15
 __________
 Total ................................. $19,990.30

The foregoing of course is not intended to create or fix any priorities in the payment of the award, but is simply a convenient method of showing the proper distribution.
After making this distribution, I have tested its justness and fairness by a comparison in general terms of the result. As to the division between the owner of the Shreveport and the salvors, in view of the fact that the Shreveport was so near to the situation of an absolute derelict and in view of the dangerous and arduous services of the crew of the Mariners Harbor, the allotment on a basis of one-third and two-thirds appears to be a fair division. The owner has been allowed the larger portion of the property, recovered in what appeared to be an almost hopeless case. As to the amount allowed the Aldecoa, an examination of the above statement will show that she will receive approximately one-ninth of the net award. I do not think the Aldecoa can complain, in view of the fact that she was exposed to no risk, and suffered no loss, except, perhaps, a slight loss from the short delay. Nor can the property salvors complain, because, if the Aldecoa had not taken aboard the Shreveport's crew, then the Mariners Harbor would have been confronted with the same situation as the Aldecoa and would have been compelled to save the lives of the crew and forego the prospects *541 of property salvage. As between the whole crew of the Mariners Harbor on the one hand and her owner and charterer on the other, it will be observed from the statement that the whole crew (including the special awards) will receive a little over one-half of the amount for distribution between the crew of the Mariners Harbor and her owner and charterer, and the owner and charterer will receive very nearly one-half. While the crew have thought they were entitled to more than this amount, yet I do not think they can complain that the award to them is parsimonious. On the other hand, it will be observed that the owner and charterer of the Mariners Harbor receive practically $20,000 for the services of the vessel for a short time and exposed to no extreme danger, and this sum is one-third of the highest value that can be possibly placed upon the Mariners Harbor. Surely a vessel which receives for such services one-third of her highest value cannot complain of niggardly treatment. As to the division among the crew of the Mariners Harbor, I have taken the list and their monthly wages, and a calculation which I believe is correct will show that, under the general award of two-fifths, each member of the crew will receive very nearly $5 for each $1 of his monthly wage. I have also added the amount the captain will receive under his special award to the amount he will receive from the two-fifths share of the whole crew, and likewise of each member of the boarding party and the navigating crew, and the figures show that the total amounts awarded to these persons are fair and cannot be considered excessive. I have examined the monthly wage of every member of the crew, and it will be found that, under the general award, every member of the crew from captain to mess boy, will receive a substantial, but not an extravagant, amount. The division between the owner and the charterer is of course governed by their contract.
The examination and comparison which I have thus made to test the fairness and justness of this distribution have confirmed my views and satisfied my own conscience. With that, I must perforce be content, and, if the parties are not, the law wisely affords a remedy.
As to the costs, while there are some circumstances which might be thought to indicate that the costs should be apportioned, yet, in view of the moderate amount awarded for the salvage services, I think the costs should be borne by the claimant, and the decree should provide for the taxation accordingly.
Let the proctors for the original libelants prepare a decree in accordance with this opinion, serve a copy thereof upon the proctors for the other parties, and submit the same to the court for signature upon ten days' notice.